**GE BETZ, INC. v. CONRAD**

[231 N.C. App. 214 (2013)]

GE BETZ, INC., Plaintiff
v.
R.C. CONRAD, ROBERT DODD, BENJAMIN LUKOWSKI, BARRY OWNINGS, and
ZEE COMPANY, INC., Defendants

No. COA13-239

Filed 3 December 2013

1. **Unfair Trade Practices—other claims subsumed—same conduct**

   A claim of unfair or deceptive practices subsumed claims for breach of contract, tortious interference, and misappropriation of trade secrets in the damages phase of litigation involving non-compete employment agreements where the same conduct gave rise to all of the claims.

2. **Evidence—parol—excluded—unambiguous non-compete agreement**

   In an action involving non-compete provisions in employment contracts, interpreted under Pennsylvania law, the trial court correctly excluded parol evidence regarding the meaning of "indirect solicitation" because the term was unambiguous.

3. **Employer and Employee—non-compete agreements—indirect solicitation**

   In an action involving non-compete provisions in employment contracts, interpreted under Pennsylvania law, the trial court was permissibly guided by a federal district court decision in finding that defendants solicited former customers through each other as proxy, and thus breached the "indirect solicitation" clauses of their employment contracts.

4. **Employer and Employee—non-compete agreement—indirect solicitation clause—no violation of public policy**

   The indirect solicitation clauses in the individual defendants' employment agreements did not exceed the scope necessary to protect plaintiff's business, and did not violate North Carolina public policy as being overbroad.

5. **Employer and Employee—confidentiality agreement—breach—finding supported by evidence**

   The trial court correctly concluded that the individual defendants breached confidentiality clauses in their employment

GE BETZ, INC. v. CONRAD

[231 N.C. App. 214 (2013)]

contracts. There was competent evidence in the record to support the court's finding that individual defendants worked for plaintiff and were exposed to confidential information as part of their employment, and that they used plaintiff's information in soliciting customers for another company.

**6. Employer and Employee—non-compete clauses—interpretation of supervisory responsibility—no consideration—change of title only**

In an action involving non-compete clauses in employment contracts, the trial court did not err in its interpretation of the term "supervisory responsibility" in the contracts or in finding the provision effective despite the absence of new consideration when two defendants accepted area manager positions. The trial court correctly applied Pennsylvania law in determining that two defendants had exercised "supervisory responsibility" before taking positions as area managers. The terms of their employment agreements did not change with their titles.

**7. Estoppel—employment agreement not found—no relief from duties—no estoppel**

Plaintiff was not estopped from seeking to penalize one of the defendants for breaching his non-compete agreement where plaintiff told defendant that it could not locate a copy of the agreement. Plaintiff never told defendant that he had no agreement, only that plaintiff could not find its copy. Defendant was not relieved of the duties imposed by the agreement.

**8. Evidence—non-compete agreement—damages from breach—causation**

The trial court did not abuse its discretion in an action involving a non-compete agreement by excluding evidence of other potential sources of the loss of customers. Plaintiff needed only to show that the acts of the individual defendants caused some injury, not that the individual defendants' acts were the exclusive reason for the customer loss. Additionally, there was evidence that was independently sufficient to prove causation.

**9. Trade Secrets—identification—formulas, pricing, proposals, costs, and sales**

The trial court, in an action on a non-compete agreement, correctly identified plaintiff's information as trade secrets. Although the individual defendants contended that plaintiff failed to identify the

trade secrets with sufficient particularity, plaintiff identified chemical formulations, pricing information, customer proposals, historical costs, and sales data that individual defendants were exposed to while working for plaintiff.

**10. Trade Secrets—sales reports and proposals—trade secrets**

Descending sales reports and customer proposals were correctly identified as trade secrets in North Carolina.

**11. Trade Secrets—transmission of information—not a failure to maintain secrecy**

Plaintiff's transmission of information to one of the individual defendants after plaintiff determined that defendant was likely to leave the company did not mean that plaintiff had failed to maintain secrecy and that the information was not a trade secret. Defendant was still bound by the confidentiality terms of his employment agreement and plaintiff could not practically employ him without giving him access to trade secret information.

**12. Trade Secrets—misappropriation—prima facie case—not rebutted**

Plaintiff sufficiently proved misappropriation of trade secrets where the individual defendants did not rebut plaintiff's *prima facie* case by showing that they acquired the trade secrets through independent development, reverse engineering, or from someone who had the right to disclose them.

**13. Unfair Trade Practices—misappropriation of trade secrets—violation of employment contracts**

The trial court did not err in an action arising from non-compete agreements by holding the individual defendants liable for violating N.C.G.S. § 75-1.1. The misappropriation of trade secrets met the three prongs necessary to find a defendant liable for violating that statute. Additionally, the individual defendants willfully violated the terms of their employment contracts, thus committing egregious activities outside the scope of their assigned duties.

**14. Damages and Remedies—joint and several liability—violation of non-compete agreements—single concerted plan**

Joint and several liability was appropriate in an action arising from non-compete agreements where the trial court properly found that the individual defendants acted in concert to harm plaintiff, their former employer. There was ample evidence in the record

to support the trial court's finding that each individual furthered a single concerted plan with their new employer to solicit the former employer's customers.

**15. Discovery—sanctions—corporate profit and revenue**

The trial court did not abuse its discretion when applying discovery sanctions in an action arising from non-compete agreements. Defendant Zee Co., Inc. conceded that its behavior in evading requests for evidence warranted sanctions, and the sanction imposed by the trial court did not impermissibly transform the measure of damages from profit to revenue.

**16. Damages and Remedies—punitive—limits—applied to each plaintiff**

The trial court erred by entering punitive damages in an action arising from non-compete agreements. N.C.G.S. § 1-25(b) requires the application of the statutory limits to punitive damages to each plaintiff rather than each defendant, as the trial court did here.

**17. Damages and Remedies—punitive—similar conduct with non-party considered—erroneous**

An award of punitive damages in an action arising from a non-compete agreement was remanded where the trial court found that defendant Zee Co., Inc. had been engaging in similar conduct with a company that was not a party, but it was not clear how much weight the court gave to those findings in entering the maximum amount of punitive damages.

**18. Attorney Fees—unreasonably persistent litigation**

The trial court did not err in an action arising from non-compete agreements by awarding plaintiff attorney fees related to defendant Zee Co., Inc.'s counterclaims. Zee persisted in litigating the case after the point where it should reasonably have been aware that there was no justiciable issue.

**19. Attorney Fees—out-of-state counsel—hourly rate**

The trial court abused its discretion in an action arising from non-compete agreements by awarding the entire attorney fee billed by a New York firm without conducting any inquiry into which of the services truly could not have been performed by local counsel at reasonable rates within the community in which the litigation took place.

**GE BETZ, INC. v. CONRAD**

[231 N.C. App. 214 (2013)]

**20. Contempt—indirect criminal—not a discovery sanction under court's inherent authority**

The trial court erred when holding an attorney in indirect criminal contempt for violation of a protective order without following the procedures provided by N.C.G.S. § 5A-15. Although plaintiff argued on appeal that the attorney was held in contempt under the trial court's inherent authority to issue contempt as a discovery sanction, plaintiff's trial counsel stated in a hearing that it was seeking criminal contempt.

**21. Attorney Fees—attorney not a party to suit**

The trial court erred by awarding plaintiff attorney fees in sanction proceedings where the attorney was not a party to the suit under the language of N.C.G.S. § 1A-1, Rule 37(b)(2), which authorized attorney fees.

**22. Attorneys—out-of-state admission revoked—contempt erroneous**

A trial court decision to revoke an attorney's admission to practice in North Carolina *pro hac vice* was remanded where a decision by that trial court holding the attorney in criminal contempt was set aside. Holding the attorney in contempt likely affected the trial court's decision to revoke his admission.

**23. Attorneys—out-of-state admission revoked—failure to disclose discipline**

The trial court did not err by revoking the *pro hac vice* admission of an attorney where the attorney had not disclosed a $1,000 fine levied against him in 1997 by a federal court in South Carolina. The plain language of N.C.G.S. § 84-4.1 requires attorneys to disclose discipline administered by both courts and lawyer regulatory organizations.

Appeals by individual defendants and Zee Company, Inc. from judgments entered 25 July 2011 and 23 May 2012 by Judge Phyllis M. Gorham in New Hanover County Superior Court. Appeal by additional appellants from orders entered 18 and 22 June 2012 by Judge Gorham in New Hanover County Superior Court. Heard in the Court of Appeals 11 September 2013.

*Ellis & Winters LLP, by Matthew W. Sawchak, Stephen D. Feldman, and Zia C. Oatley, for individual defendants-appellants.*

**GE BETZ, INC. v. CONRAD**

[231 N.C. App. 214 (2013)]

*Robinson Bradshaw & Hinson, P.A., by John R. Wester, Jonathan C. Krisko, and Pearlynn G. Houck, for defendant-appellant Zee Company, Inc.*

*Graebe Hanna & Sullivan, PLLC, by Mark R. Sigmon, for additional appellants.*

*McGuireWoods, LLP, by Bradley R. Kutrow and Monica E. Webb, and Ward and Smith, P.A., by Jenna Fruechtenicht Butler and John M. Martin, for plaintiff-appellee GE Betz, Inc.*

HUNTER, Robert C., Judge.

Three categories of appellants bring distinct issues before us in this case.

First, R.C. Conrad, Robert Dodd, Benjamin Lukowski, and Barry Owings (collectively "individual defendants") appeal from judgment entered 25 July 2011 by Judge Phyllis M. Gorham in New Hanover County Superior Court. On appeal, individual defendants argue that the trial court erred by: (1) misinterpreting various provisions of the employment agreement they had with GE Betz, Inc. ("GE") and concluding that individual defendants breached their contracts, (2) allowing GE to succeed on the merits of its claims without proving causation, and (3) concluding that individual defendants used GE's trade secrets and violated N.C. Gen. Stat. § 75-1.1. After careful review, we affirm the trial court's judgment as to these individual defendants.

Second, Zee Company, Inc. ("Zee") appeals the trial court's award of damages and attorneys' fees. Zee argues that the trial court erred by: (1) as a discovery sanction, allowing GE to use Zee's gross sales as a measure of compensatory damages, (2) entering punitive damages that violated defendants' due process rights and were impermissibly levied on a per-defendant rather than per-plaintiff basis, and (3) awarding unreasonable attorneys' fees and erroneously awarding GE fees incurred as a result of Zee's counterclaims. We affirm the trial court's judgment as to the measure of compensatory damages, but reverse and remand as to punitive damages and attorneys' fees.

Third, Mark A. Dombroff ("Dombroff") and Thomas B. Almy ("Almy") (collectively "additional appellants") appeal from the trial court's orders holding Almy in criminal contempt of court, ordering Almy to pay GE's attorneys' fees in addition to $500.00 as a contempt sanction,

and revoking the *pro hac vice* admissions of both Dombroff and Almy. On appeal, additional appellants claim: (1) the trial court failed to follow statutory and constitutional procedures in holding Almy in criminal contempt of court, (2) the court erred by ordering Almy to pay GE's attorneys' fees because Almy was not a "party" under the language of the statute authorizing the fee award, and (3) the court abused its discretion by revoking additional appellants' *pro hac vice* admissions. We reverse the trial court's orders as to Almy's criminal contempt and attorneys' fees, remand for reconsideration of Almy's *pro hac vice* revocation, and affirm the court's order revoking Dombroff's *pro hac vice* admission.

## I. BACKGROUND

### A. Substantive Claims

Individual defendants were employees of Betz Entec or BetzDearborn, alternative names for the same company, which was acquired by GE and renamed GE Betz, Inc. ("GE"). They signed employment agreements before GE acquired the company. The employment agreements contained language restricting individual defendants from "directly or indirectly" soliciting GE's current or prospective customers with whom the individual had "any contact, communication or . . . supervisory responsibility" for eighteen months after employment with GE ended. The agreements also prohibited disclosure or misuse of GE's confidential information, including sales data, formulas, costs, treatment techniques, and customer information. The agreements state that they shall be construed under and governed by Pennsylvania law.

In 2006, GE's restructuring of its water treatment business resulted in the layoffs of defendants Conrad and Dodd. Conrad and Dodd began working for Zee shortly thereafter. During the restructuring, GE created a position of "area manager" and offered the area manager positions to defendants Owings and Lukowski. GE did not increase Owings's or Lukowski's compensation, and the position offers contained no compensation terms. On 18 July 2006, Zee offered Owings a job as a "team leader"; Owings never told GE he had an offer from Zee and was allowed to remain working at GE for two weeks after Zee's offer.

Following the "area manager" offers, GE began to email Owings and Lukowski "descending sales reports," which contained reports of actual sales and sales forecasts of about 175 GE customers. Owings and Lukowski ultimately resigned; Owings never received an offer letter for the area manager position and Lukowski stated via letter that he wanted to evaluate "other opportunities inside and outside" the water treatment industry. Lukowski continued receiving descending sales reports from

GE after he hinted at resignation and was considered to be an "immediate flight risk." Lukowski did not notify GE that he was leaving until two weeks after signing an employment agreement with Zee and did not notify GE he was joining a competitor. Shortly after resigning, Owings and Lukowski started working for Zee. The trial court found as fact that Owings and Lukowski affirmatively misled GE about their post-resignation plans.

Lukowski asked GE for a copy of his employment agreement, but did not receive it until weeks after beginning employment with Zee. In the interim between beginning employment with Zee and receiving his employment agreement, Lukowski contacted customers he previously helped while employed by GE. The trial court found as fact that all individual defendants began contacting former GE customers that they or another team member serviced or supervised while employed by GE and that Zee knew about and encouraged this conduct. GE learned of these tactics and sent cease-and-desist letters enclosed with copies of the employment agreements to Lukowski, Dodd, and Zee's President, Robert Bullard. GE informed Zee that individual defendants were "cross-selling" to each other's former GE customers and directly contacting GE customers. Zee responded that individual defendants were not competing with GE because they were selling products unrelated to the water treatment industry.

GE sued Zee and individual defendants in April 2007. GE sought a preliminary injunction to preclude all defendants from contacting around 175 companies that GE contended were covered by individual defendants' non-solicitation clauses. The trial court granted the injunction except as to ten "carve-out" companies ("carve-outs") with which Zee had already obtained contracts. GE retained its claim for monetary recovery for Zee's sales to the carve-outs, and GE ultimately sought damages for conduct regarding eight of the carve-outs.[1]

The employment agreements forbade individual defendants from "directly or indirectly . . . call[ing] upon, communicat[ing] or attempt[ing] to communicate with any customer . . . for the purpose of selling" competing products, services, or equipment. The trial court determined as a matter of Pennsylvania law that "indirect communication occurs when a member of a sales team contacts a prohibited customer of another team member." The court granted GE's motion *in limine*

---

1. These eight carve-outs were CMS Generation, DAK, Danaher Controls, Intercontinental Hardwoods, OMI, Shamrock Environmental, Shaw Environmental, and Wayne Memorial Hospital.

to prevent individual defendants from introducing parole evidence as to the meaning of the terms "switching" or "cross-selling" in their employment agreements. The trial court also excluded evidence that GE's customer departures stemmed from causes other than defendants' actions. However, the trial court admitted evidence of a lawsuit filed 12 September 2006 by another water treatment company, Chem-Aqua, in which Chem-Aqua alleged that Zee tortiously interfered with the contracts of Chem-Aqua employees, among other claims. The case settled with Zee admitting no wrongdoing and no money exchanging hands between the parties.

The trial court ultimately ruled that all individual defendants violated their employment agreements by indirectly or directly soliciting GE customers and breaching confidentiality terms and that Owings and Lukowski exercised supervisory responsibility while employed by GE. All defendants were held liable for misappropriating trade secrets, violating N.C. Gen. Stat. § 75-1.1, and Zee was individually held liable for tortiously interfering with individual defendants' employment contracts. The court awarded GE compensatory and punitive damages and attorneys' fees and costs. Zee and individual defendants filed timely notices of appeal.

## B. Damages and Attorneys' Fees

Following the trial court's final ruling in its favor, GE had the option of seeking disgorgement of Zee's profits or its own lost profits as damages for its claim of unfair or deceptive practices pursuant to section 75-1.1[2] It sought to ascertain Zee's profits generated from sales to eight of the carve-outs identified in the preliminary injunction. However, over the course of more than two years, Zee failed to produce documentation of its net profits from the carve-outs, in contravention of multiple orders to compel. The trial court also reopened depositions upon motion from GE at which Zee had the opportunity to present evidence of its net profits generated from the carve-outs, but Zee's witnesses declined to do so. Months later, Zee designated defendant Owings to proffer that the industry-wide net profit margin "averages between 10 and 12 percent."

---

2. [1] The claim of unfair or deceptive practices subsumed the claims for breach of contract, tortious interference, and misappropriation of trade secrets in the damages phase of litigation because the same conduct gave rise to all claims. *See Decker v. Homes, Inc./Constr. Mgmt. & Fin. Grp.*, 187 N.C. App. 658, 666, 654 S.E.2d 495, 501 (2007) ("[W]here the same source of conduct gives rise to a traditionally recognized cause of action, as, for example, an action for breach of contract, and as well gives rise to a cause of action for violation of G.S. 75-1.1, damages may be recovered either for the breach of contract, or for violation of G.S. 75-1.1, but not for both.") (citation and quotation marks omitted).

GE filed a motion on 12 February 2010 seeking discovery sanctions for Zee's refusal to provide net profit data for its sales to the carve-outs. The trial court granted GE's motion and sanctioned Zee by permitting GE to use Zee's gross sales to the carve-outs as the basis for its compensatory damages, as well as prohibiting Zee and Zee's witnesses from offering any evidence regarding GE's damages. GE subsequently elected to use the measure of gross sales to eight of the carve-outs, totaling $288,297.00, as compensatory damages. The trial court entered judgment awarding GE $288,297.00 in compensatory damages against all defendants jointly and severally based on these gross sales.

The trial court conducted a separate hearing to assess GE's requests for punitive damages and attorneys' fees. In its final judgment, the court found that each defendant individually had engaged in acts that warranted the maximum amount of punitive damages allowed by N.C. Gen. Stat. § 1D-25(b). As such, it awarded punitive damages in the amount of $864,891.00, three times the compensatory damages of $288,297.00, against each defendant individually, totaling $4,324,455.00 in punitive damages.

GE also sought reimbursement for attorneys' fees from all defendants, jointly and severally, based on N.C. Gen. Stat. §§ 75-16.1, 66-154(d), and 1D-45. It submitted billing summaries from both Ward and Smith P.A. ("Ward and Smith"), its North Carolina law firm, and Paul Hastings LLP ("Paul Hastings"), its New York law firm. Over $3 million of the $5,769,903.10 requested by GE was billed by Paul Hastings attorneys. Paul Hastings' lead attorney billed GE at rates between $633.25 and $675.75 per hour over the course of the litigation, reduced from her standard rates between $745.00 and $915.00 per hour[3]; its associate attorneys billed GE at rates varying between $289.00 and $552.50 per hour. Ward and Smith's lead attorneys billed GE at rates between $270.00 and $390.00 per hour. The trial court awarded GE the full amount of its fee request jointly and severally against defendants — $5,769,903.10 in attorneys' fees and $69,888.32 in costs. It also awarded GE $188,043.12 in costs against individual defendants, jointly and severally, pursuant to their employment agreements.

In sum, the trial court awarded GE $10,640,586.55.

### C. Additional Appellants

Additional appellants are members of Dombroff, Gilmore, Jaques & French, P.A. ("the Dombroff firm"). At the outset of the underlying

---

3. Prices increased annually over the course of the litigation.

litigation, defendants were represented by the law firm of Williams Mullen Maupin Taylor P.A. ("Williams Mullen"). Defendants released Williams Mullen in April 2010 and retained the Dombroff firm to represent them against GE and in a malpractice case brought in Virginia federal court ("the Virginia action") against Williams Mullen arising out of Williams Mullen's representation of defendants in the underlying case. Additional appellants are licensed to practice law in the Commonwealth of Virginia and the District of Columbia; they were admitted *pro hac vice* to represent defendants in the underlying North Carolina action.

Shortly after GE initiated its case against defendants, two protective orders were entered which governed the treatment of confidential documents. Both orders prohibited the use of confidential information, including any customer list, for any purposes except "in furtherance of the prosecution or defense of this action"; the orders also stated that confidential information "shall not be used or disclosed by any person for any other purpose."

GE filed its first motion to enforce the protective orders on 12 October 2011, claiming that Dombroff had violated the orders on three separate occasions by introducing confidential documents during depositions taken in the Virginia action. Additional appellants claimed that GE had agreed to the use of the documents, marking them as confidential, and separating them from the other exhibits in the Virginia action. The trial court found that the protective order had been violated and warned that further unauthorized disclosure "should not occur again . . . unless the attorney for GE and [additional appellants] have some agreement or have a court order" and that "any further documents . . . will remain confidential documents." The trial court further stated that additional violations may result in the offending attorneys being held in contempt.

On Thursday, 15 March 2012, Almy electronically filed a brief in the Virginia action in opposition to Williams Mullen's motion for summary judgment; attached to the brief was GE's customer list, which had been designated as confidential and maintained under seal in the underlying litigation. The brief and attached customer list were filed via the court's CM/ECF[4] system and were therefore publicly available through PACER[5]. On the afternoon of Friday, 16 March 2012, GE's counsel learned of the public filing of GE's customer list and contacted the Dombroff firm,

---

4. "CM/ECF" stands for "Case Management/Electronic Case Files."

5. "PACER" stands for "Public Access to Court Electronic Records."

asking that it be taken down. Almy and other attorneys in the Dombroff firm reviewed the matter over that weekend, and on the afternoon of Tuesday, 20 March 2012, they filed a consent motion to remove the customer list from the docket. The court entered the consent order on 21 March 2012 and the customer list was removed. It was available to the public for six days.

On Monday, 19 March 2012, GE filed motions seeking sanctions against both Dombroff and Almy under Rule 37 of the North Carolina Rules of Civil Procedure and an order for them to show cause why they should not be held in contempt of court. These matters were heard on 19 April 2012. Almy argued that he was aware of the protective order on the client list, but he did not think that it was confidential at the time of filing because GE had attempted to offer the list into evidence twice before and had questioned a witness about the list in open court. However, Almy admitted at the hearing that he violated the protective order when he filed the customer list and took full responsibility for doing so.

The trial court ruled on GE's motion for sanctions on 31 May 2012 and entered a written order on 22 June 2012. The court held Almy in criminal contempt of court, ordered him to pay GE $500.00 as a sanction for his "willful violation" of the protective orders, and ordered him to pay the attorneys' fees incurred by GE in its pursuit of sanctions. Additionally, the court revoked the *pro hac vice* admissions of both Dombroff and Almy. Additional appellants filed timely notices of appeal.

## II.  DISCUSSION OF INDIVIDUAL DEFENDANTS' APPEAL

### A.  Employment Agreements

### 1.  Indirect Solicitation

Individual defendants first argue that the trial court misinterpreted the term "indirect solicitation" in their employment agreements. They contend that the term was ambiguous, that the trial court overly relied on *Diversey Lever, Inc. v. Hammond*, 1997 WL 28711 (E.D. Pa. Jan. 24, 1997), and that the "indirect solicitation" restriction is against North Carolina public policy. After careful review, we affirm the trial court's judgment as to this issue.

Contract interpretation is a question of law to be reviewed *de novo*. *Harris v. Ray Johnson Constr. Co.*, 139 N.C. App. 827, 829, 534 S.E.2d 653, 654 (2000). "Under a de novo review, the court considers the matter anew and freely substitutes its own judgment" for that of the lower tribunal. *Craig v. New Hanover County Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009). Issues involving contract interpretation are

analyzed under Pennsylvania law in this case due to the choice of law clause in the employment agreements.

**[2]** Individual defendants first argue that the term "indirect solicitation" is ambiguous. Under Pennsylvania law, "[w]hen the words of a contract are clear and unambiguous, the intent of the parties must be ascertained from the language employed in the contract, which shall be given its commonly accepted and plain meaning." *TruServ Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 260 (Pa. 2012). Pennsylvania state courts define ambiguity as "duplicity, indistinctness or uncertainty of meaning of an expression used in a written instrument." *In re Miller's Estate*, 26 Pa. Super. 443, 449 (1904). Pennsylvania state courts have not yet interpreted the word "indirect," but authority from Pennsylvania federal courts shows that a restrictive covenant prohibiting a defendant from "directly or indirectly" engaging in certain conduct was unambiguous, because to rule otherwise would negate the words from the contract. *Plate Fabrication & Machining, Inc. v. Beiler*, 2006 WL 14515, at *5 (E.D. Pa. Jan. 3, 2006). We find this reasoning persuasive. Evidence of individual defendants' direct and indirect cross-selling to former GE customers was presented at trial, and the trial court made detailed factual findings based on that evidence. The trial court properly interpreted "indirect solicitation" to include one individual defendant soliciting a carve-out customer with whom another individual defendant previously had contact at GE. The trial court was therefore correct in excluding parol evidence regarding the meaning of "indirect solicitation," because the term, under Pennsylvania law, was unambiguous. *See Plate Fabrication*, 2006 WL 14515, at *5.

**[3]** Individual defendants next argue that the trial court relied too heavily on *Diversey*. In *Diversey*, the United States District Court for the Eastern District of Pennsylvania held that employees violated the "indirect solicitation" clause of their employment agreements by contacting each other's former customers, without direct evidence that the employees affirmatively aided each other with the solicitations. *Diversey* at *22. The court found that the defendants used concerted action through a shell company and its employees "to accomplish indirectly what they cannot do directly". *Id.*

Though *Diversey* is not controlling, the logic used by the *Diversey* court is persuasive. On a very similar set of facts, the *Diversey* court noted that allowing the defendants to continue using third-party employees of their new company to solicit former customers of their old company would go wholly against the "indirect solicitation" clause of their contract. *Id.* In the present case, allowing individual defendants to

solicit each other's former customers would nullify the word "indirectly" out of the contract. The trial court found as fact, and we find competent evidence to support the findings, that each individual, in concert, solicited former GE customers through the other individual defendants as proxy. The trial court was not bound by *Diversey*, but was permissibly guided by its reasoning in finding individual defendants liable for breaching the "indirect solicitation" clauses of their employment agreements. We find the trial court did not err by adopting the reasoning set forth by the *Diversey* opinion, given its factual similarity to this case.

**[4]** Individual defendants also contend that the "indirect solicitation" provision of the employment contracts is against North Carolina public policy for being overbroad. Under North Carolina law, a restrictive covenant can be "no wider in scope than is necessary to protect the business of the employer." *Manpower of Guilford Cnty., Inc. v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979). Individual defendants argue that the "indirect solicitation" provisions exceed the scope necessary to protect GE's business. They also assert that upholding such a provision would effectively bar employers from hiring former GE employees, since none of the company's other employees would be permitted to solicit GE customers. We disagree with this broad characterization of the "indirect solicitation" provision and its speculative effect on the market.

First, the trial court found as fact, and there is competent evidence to support the finding, that Zee engaged in a concerted effort to exclusively hire former GE employees that would specifically target GE customers. This is distinguishable from a situation where a company hires employees who happened to have worked at GE. Second, GE's share of the North Carolina water treatment market was only 3%, leaving Zee 97% of the market of non-GE customers to solicit. Contrary to individual defendants' theory, protecting GE's own market share hardly threatened to drive Zee out of the North Carolina water treatment market and did not exceed the scope necessary for GE to protect its business. Third, the "indirect solicitation" provision of the employment contracts only lasted for eighteen months after the individuals left GE. Such time constraint was not unreasonable in scope because it allowed GE's other employees to build relationships with and retain its customers that were serviced by individual defendants before those individuals could begin soliciting the customers on behalf of their new company. *See Redlee/SCS, Inc. v. Pieper*, 153 N.C. App. 421, 426, 571 S.E.2d 8, 13 (2002) ("[T]wo to five years has repeatedly been held a reasonable time restriction in a non-competition agreement.") (citation omitted). Because the "indirect

solicitation" clauses in the individual defendants' employment agreements did not exceed the scope necessary to protect GE's business, we find that the "indirect solicitation" clauses do not violate North Carolina public policy.

In sum, we affirm the trial court's conclusion that individual defendants breached the "indirect solicitation" terms of their employment agreements.

## 2. Confidentiality Provisions

[5] Individual defendants next claim that the trial court erred in analyzing the confidentiality clauses of the employment agreements by relying only on circumstantial evidence and the *Diversey* reasoning, which they argue is flawed. We affirm the trial court's conclusion that individual defendants breached the confidentiality terms of their agreements.

"Conclusions of law drawn by the trial court from its findings of fact are reviewable de novo on appeal." *Carolina Power & Light Co. v. City of Asheville*, 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004).

This is a question of evidentiary weight and not contract interpretation; as such, we apply North Carolina law rather than Pennsylvania law because the choice of law clause in the employment agreements does not apply. In this state, "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence." *State v. Adcock*, 310 N.C. 1, 36, 310 S.E.2d 587, 607 (1984). Circumstantial evidence that a defendant acquired a plaintiff's customer contracts for a competing business was previously held "sufficient circumstantial evidence to sustain a finding that the defendant knew of the confidential information, had the opportunity to acquire it for his own use and did so[,]" and thus violated a confidentiality agreement in the employment contract between the plaintiff and the defendant. *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 377, 542 S.E.2d 689, 693 (2001).

There is competent evidence in the record to support the court's findings that individual defendants worked for GE and were exposed to confidential information as part of their employment, and that individual defendants utilized GE pricing formulas and proposals to create the same for Zee in soliciting carve-out customers. Therefore, it can reasonably be inferred through this circumstantial evidence that individual defendants, like the defendant in *Byrd's*, "knew of the confidential information, had the opportunity to acquire it for [their] own use and did so." *Byrd's*, 142 N.C. App. at 377, 542 S.E.2d at 693. Because GE introduced sufficient evidence for the trial court to reasonably find that

each individual defendant acquired confidential information during their employment with GE and that such information was utilized by Zee in its customer proposals, we affirm the trial court's conclusion that individual defendants breached the confidentiality clauses of the employment agreements.

### 3. Supervisory Responsibility

[6] Individual defendants next claim that the trial court misinterpreted the term "supervisory responsibility" by disregarding its plain meaning. They also argue that the trial court failed to find the provision ineffective for lack of consideration and salary terms when Owings and Lukowski took the area manager positions. We disagree.

As this is a contract interpretation issue, we assess the trial court's application of Pennsylvania law. However, the standard of review for this Court remains based on North Carolina law. *See Sears Roebuck & Co. v. Avery*, 163 N.C. App. 207, 211, 593 S.E.2d 424, 428 (2004) (applying Arizona law to interpret a contract based on a choice of law provision, but reviewing the trial court's order based on a North Carolina standard of review). Contract interpretation is a question of law, which is reviewed *de novo* on appeal. *Harris v. Ray Johnson Constr. Co.*, 139 N.C. App. 827, 829, 534 S.E.2d 653, 654 (2000); *Carolina Power & Light Co.*, 358 N.C. at 517, 597 S.E.2d at 721. Under Pennsylvania law, when a contract does not define a term, that term takes its ordinary meaning. *Kripp v. Kripp*, 849 A.2d 1159, 1163 (Pa. 2004).

The non-solicitation clauses in individual defendants' employment contracts forbade communication with any customer, representative, or prospective customer with whom the employee had "any contact, communication or for which [e]mployee had supervisory responsibility". Owings and Lukowski claim that when they began acting as area managers, the scope of the non-solicitation clauses expanded because they exercised greater supervisory responsibility. Though the trial court found as fact that Owings and Lukowski exercised "supervisory responsibility" prior to taking positions as area managers, individual defendants challenge the court's interpretation of "supervisory responsibility" giving rise to that finding.

Individual defendants first argue that the trial court misapplied the term "supervisory responsibility" and that the term implicitly requires overseeing and being accountable for a customer relationship. Lukowski and Owings managed teams of regional salespeople in North Carolina. Owings managed a team of sales representatives and oversaw customer sales, forecasting, and customer contacts prior to taking the position

as area manager. Lukowski managed a team of sales representatives, participated in personnel review, collected customer information, and developed sales reports prior to taking the position as area manager. In those positions they were responsible for a region of North Carolina sales and supervised a team of salespeople to solicit business for GE. We find that such conduct constitutes "supervisory responsibility" under the plain meaning of the words. *See Profit Wize Mktg. v. Wiest*, 812 A.2d 1270, 1274-75 (Pa. Super. Ct. 2002) ("As the parties have the right to make their own contract, we will not modify the plain meaning of the words under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used."). As such, we affirm the trial court's application of Pennsylvania law in its conclusion that Owings and Lukowski exercised "supervisory responsibility" before taking positions as area managers.

Individual defendants also argue that the "supervisory responsibility" provision is invalid for lack of consideration. Individual defendants claim that no Pennsylvania law is on point and therefore cite to a Massachusetts case holding that when a restrictive covenant is greatly expanded, new consideration is necessary for that covenant to be enforceable. *F.A. Bartlett Tree Expert Co. v. Barrington*, 233 N.E.2d 756, 758 (Mass. 1968). Under the rule in *Barrington* proffered by individual defendants, "[t]he question to be decided is whether the change in the duties . . . resulted in a revocation of the previous employment agreement" which would require new consideration, "or in a modification of that agreement" which would not require new consideration. *See Mail-Well Envelope Co. v. Saley*, 497 P.2d 364, 368 (Ore. 1972) (applying the *Barrington* rule to hold that an employment agreement was modified, rather than revoked by implication, and therefore did not require new consideration when an employee obtained supervisory duties). Even applying individual defendants' proffered rule, we find that Owings's and Lukowski's restrictive covenants did not require new consideration when they became area managers. Owings and Lukowski managed sales teams, conducted personnel review, and oversaw customer sales, forecasting, and customer contacts prior to taking positions as area managers. As area managers, they began receiving descending sales reports containing information related to about 175 GE customer accounts but kept performing their key duties as before. We hold, due to the similar duties before and after acquiring area manager status, that Owings's and Lukowski's employment agreements were modified only in title, and therefore did not require new consideration.

**GE BETZ, INC. v. CONRAD**

[231 N.C. App. 214 (2013)]

Likewise, individual defendants' contention that their oral agreements to area manager positions were ineffective for lack of a salary term also fails. Because Owings and Lukowski exercised supervisory responsibility before their transitions to area managers, the terms of their employment agreements did not change with their titles. Additionally, because we find Owings's and Lukowski's contracts were modified rather than revoked, we conclude that their transition to area managers did not require a new salary term for their employment agreements to be enforceable. *See Saley,* 497 P.2d at 368.

### 4. Equitable Estoppel

**[7]** As an additional matter to the terms of the agreement, individual defendants claim that GE was estopped from penalizing Lukowski for breaching his employment agreement because GE told Lukowski that it could not locate a copy of his employment agreement. We disagree.

> The essential elements of estoppel are (1) conduct on the part of the party sought to be estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct will be acted on by the other party; and (3) knowledge, actual or constructive, of the real facts. The party asserting the defense must have (1) a lack of knowledge and the means of knowledge as to the real facts in question; and (2) relied upon the conduct of the party sought to be estopped to his prejudice.

*Friedland v. Gales,* 131 N.C. App. 802, 807, 509 S.E.2d 793, 796-97 (1998).

GE's failure to immediately present Lukowski with a copy of his employment agreement did not relieve Lukowski of the duties imposed on him by that agreement. GE never informed Lukowski that he had no employment agreement - only that GE could not locate a copy of it, and that he should refer to his personal records since he was provided a copy when he began employment with GE. GE's inability to locate a copy of Lukowski's employment agreement was not the "false representation or concealment of material facts" that equitable estoppel was designed to protect against. *See id.* We therefore affirm the trial court's conclusion that Lukowski was still subject to the obligations of the employment agreement even if GE temporarily could not locate a copy of it.

### B. Causation

**[8]** Individual defendants next claim that the trial court's exclusion of evidence relevant to whether GE's customers left for reasons other than

individual defendants' behavior was in error because GE failed to prove but-for causation. GE claims that the exclusion of such evidence did not negate its burden to prove but-for causation and that causation was proven. We affirm the trial court's exclusion of the evidence.

A trial court's decision to exclude evidence is reviewed for an abuse of discretion. *Media Network, Inc. v. Long Haymes Carr, Inc.*, 197 N.C. App. 433, 458, 678 S.E.2d 671, 687 (2009). "The test for abuse of discretion is whether a decision is manifestly unsupported by reason, or so arbitrary that it could not have been the result of a reasoned decision." *Little v. Penn Ventilator Co.*, 317 N.C. 206, 218, 345 S.E.2d 204, 212 (1986) (quotation marks and citation omitted). A plaintiff may recover on a claim of unfair or deceptive practices where the plaintiff demonstrates the act of deception proximately caused some adverse impact or injury. *Walker v. Sloan*, 137 N.C. App. 387, 399, 529 S.E.2d 236, 245 (2000) (citation omitted). A motion *in limine* is typically insufficient to preserve for appeal the admissibility of evidence; however, a party may preserve the exclusion of evidence for appellate review by making a specific offer of proof. *Ziong v. Marks*, 193 N.C. App. 644, 647-48, 668 S.E.2d 594, 597 (2008).

The record indicates that individual defendants preserved the issue of excluded evidence for appeal by making offers of proof regarding why GE customers moved their business away from GE. Accordingly, we will address this argument.

Though the trial court excluded evidence that may have shown other reasons GE customers moved their business away from GE, such exclusion does not equate to a ruling that GE did not have to prove causation. GE needed only to show that individual defendants' acts caused GE some injury, not that individual defendants' acts were the exclusive reason for GE's customer loss. *See Walker*, 137 N.C. App. at 399, 529 S.E.2d at 245. Zee conceded at oral argument that revenue that went to Zee would have gone to GE but for Zee's conduct. Additionally, there is sufficient evidence in the record to support the court's findings that the carve-outs were GE customers prior to individual defendants' solicitation and that the carve-outs moved their business to Zee as a result of individual defendants' solicitation. We find that such evidence is independently sufficient to prove causation between Zee's conduct and GE's injury. Even if GE might have lost customers for reasons other than individual defendants' conduct, such evidence would not negate the fact that individual defendants improperly solicited and unjustly profited from the carve-out customers, thus causing some amount of injury to GE and therefore meeting the element of causation in GE's claims.

Therefore, the exclusion of evidence pertaining to other reasons GE's customers may have moved their business was not arbitrary or "manifestly unsupported by reason." *Little v. Penn Ventilator Co.*, 317 N.C. at 218, 345 S.E.2d at 212. Because GE submitted sufficient evidence that individual defendants caused GE injury, we find the trial court did not abuse its discretion by excluding evidence of other potential sources of loss of customers for GE.

### C. Trade Secrets and Unfair or Deceptive Practices

### 1. Trade Secrets

[9] Individual defendants argue that the information GE represented as a trade secret did not meet the statutory definition of a trade secret. GE contends that it established a *prima facie* case that individual defendants misappropriated trade secrets, and individual defendants failed to show the trade secrets were acquired properly. We affirm the trial court's conclusion that individual defendants misappropriated GE's trade secrets.

In North Carolina:

> "Trade secret" means business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
>> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>>
>> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3) (2011). This Court has held that cost history records; pricing policies, formulas, and information; and customer lists constitute trade secrets. *Byrd's*, 142 N.C. App. at 376, 542 S.E.2d at 692; *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 59, 620 S.E.2d 222, 230 (2005); *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 173, 423 S.E.2d 324, 327 (1992). To make a *prima facie* case of trade secret misappropriation, a plaintiff must show that a defendant: "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat.

§ 66–155 (2011). A claim for misappropriation of trade secrets may be proven through circumstantial evidence. *Byrd's*, 142 N.C. App. at 376, 542 S.E.2d at 692. A trade secret must be alleged "with sufficient particularity . . . to enable a defendant to delineate that which he is accused of misappropriating" and to allow a court to decide whether misappropriation has occurred. *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003). Once a plaintiff establishes a *prima facie* case, the burden shifts to the defendant to rebut a presumption that the trade secrets were misappropriated. *Sunbelt*, 174 N.C. App. at 58, 620 S.E.2d at 229.

[10] Individual defendants claim that GE failed to identify what information was a trade secret with sufficient particularity. GE specifically identified chemical formulations, pricing information, customer proposals, historical costs, and sales data that individual defendants were exposed to at GE. Such information has been held to derive independent commercial value from not being generally known. *Byrd's*, 142 N.C. App. at 376, 542 S.E.2d at 692. The documents and contents of GE's evidence listed above were alleged with sufficient particularity for individual defendants to delineate that which they were accused of misappropriating and for the trial court to determine whether a misappropriation occurred. *See Analog Devices*, 157 N.C. App. at 468, 579 S.E.2d at 453. Because GE identified the contents of the misappropriated documents with sufficient particularity, we find the trial court correctly identified the information as trade secrets.

Individual defendants also claim that the GE descending sales reports, customer proposals, and other unidentified trade secrets do not satisfy the definition of a trade secret. We disagree. The descending sales reports, for example, contained history of actual sales and sales forecasts. GE's descending sales reports and customer proposals are analogous to the cost history records, customer lists, and financial projections previously found to be business information that derives independent commercial value. *See Byrd's*, 142 N.C. App. at 376, 542 S.E.2d at 692; *Sunbelt*, 174 N.C. App. at 58, 620 S.E.2d at 229; *Drouillard*, 108 N.C. App. at 173, 423 S.E.2d at 327. The trial court was therefore correct in holding that the information submitted by GE constituted trade secrets as defined in North Carolina.

[11] Additionally, individual defendants contend that GE's transmission of information to Lukowski after they determined he may be likely to leave for another company invalidates the argument that such information was a trade secret, because GE failed to maintain its secrecy. *See* N.C. Gen. Stat. § 66-152(3)(b) (2011) (a trade secret must be "the subject

of efforts that are reasonable under the circumstances to maintain its secrecy"). This contention is unpersuasive, as Lukowski was still bound by the confidentiality terms of his employment agreement and GE could not practically employ Lukowski without giving him access to trade secret information.

[12] We also find that GE sufficiently proved misappropriation of the trade secrets. " 'Misappropriation' means acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." N.C. Gen. Stat. § 66-152(1) (2011). Individual defendants failed to show that they acquired GE trade secrets through independent development, reverse engineering, or from someone who had the right to disclose them, and therefore did not rebut GE's *prima facie* case for trade secret misappropriation.

Because GE identified documents containing trade secret information pursuant to section 66-152 with sufficient particularity, and individual defendants failed to rebut GE's *prima facie* case that they misappropriated those trade secrets, we affirm the trial court as to this issue.

## 2. Unfair or Deceptive Practices

[13] Individual defendants argue that the trial court's error in identifying trade secrets affected the court's analysis of joint and several liability and section 75-1.1 liability. We affirm the trial court's conclusions as to both.

Joint and several liability is allowed when (1) defendants have acted in concert to commit a wrong that caused an injury; or (2) defendants, even without acting in concert, have committed separate wrongs that still produced an indivisible injury. *Bost v. Metcalfe*, 219 N.C. 607, 610, 14 S.E.2d 648, 651 (1941). Concerted action is when "two or more persons unite or intentionally act in concert in committing a wrongful act, or participate therein with common intent." *Garrett v. Garrett*, 228 N.C. 530, 531, 46 S.E.2d 302, 302 (1948). Section 75-1.1 makes unlawful "unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" N.C. Gen. Stat. § 75–1.1 (2011).[6] Employees have been found liable for committing

---

6. Here, the trial court uses the phrase "unfair or deceptive *trade* practices." Although this language remains common in legal parlance today, the General Assembly omitted the word "trade" from section 75-1.1 in 1977. Ch. 747, sec. 1, 1977 N.C. Sess. Laws 1026.

unfair or deceptive acts when their actions involved egregious activities outside the scope of employment and would otherwise violate section 75-1.1. *See Songwooyarn Trading Co., Ltd. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56-57, 714 S.E.2d 162, 167-68 (2011).

This Court has held that violations of section 66-152 may also violate section 75-1.1. *See Drouillard*, 108 N.C. App. at 172, 423 S.E.2d at 326.

> [A]ll defendants need to show to maintain a cause of action under [section 75-1.1] is (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) proximately causing actual injury to defendant or defendant business. *Spartan Leasing v. Pollard*, 101 N.C. App. 450, 400 S.E.2d 476 (1991). If the violation of [section 66-152] satisfies this three prong test, it would be a violation of N.C. Gen. Stat. § 75–1.1.

*Id.* Here, the trial court found as fact that:

> 25. GE's customer proposals, chemical formulations and products, customer pricing, and other customer-specific sales information are trade secrets under N.C. Gen. Stat. §§ 66-152, *et. seq.* [Individual defendants] misappropriated trade secrets in violation of N.C. Gen. Stat. § 66-152, *et. seq.* The misappropriation of GE's trade secrets by [individual defendants] and Zee was a cause of GE's loss of business from those customers.

> 26. GE has introduced substantial evidence that the individual [d]efendants and Zee knew of the trade secrets at issue, had specific opportunities to disclose and use the trade secrets, did use and disclose the trade secrets, which disclosure and use was without the express or implied consent or authority of GE, and that Zee and the individual [d]efendants have been unjustly enriched as a result of the misappropriation of the trade secrets at issue.

> 27. The acts of the individual defendants and Zee constitute unfair and deceptive trade [sic.] practices pursuant to [section 75-1.1].

Here, because individual defendants' misappropriation of GE's trade secrets met the three prongs necessary to find a defendant liable for violating section 75-1.1, we hold that the trial court did not err in finding individual defendants liable for violating section 75-1.1. *See id.*

Additionally, our Supreme Court has allowed individual liability for unfair or deceptive practices against employees when the employee's acts "(1) involved egregious activities outside the scope of [their] assigned employment duties, and (2) otherwise qualified as unfair or deceptive practices that were in or affecting commerce." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 710–11 (2001). Here, individual defendants had ongoing "employment duties" to comply with the terms of their employment contracts, and by willfully violating the terms of those contracts, individual defendants committed "egregious activities outside the scope" of those duties. *See Dalton*, 353 N.C. at 656, 548 S.E.2d at 710-11. Such activity was sufficient to find individual defendants liable for violating section 75-1.1.

**[14]** Individual defendants also contend that GE failed to provide evidence that all individual defendants acted in concert to each carve-out to allow joint and several liability. Concerted action in a section 75-1.1 violation has previously been held to give rise to joint and several liability. *Pinehurst, Inc. v. O'Leary Bros. Realty, Inc.*, 79 N.C. App. 51, 56-58, 338 S.E.2d 918, 921-22 (1986); *Excel Staffing Serv., Inc. v. HP Reidsville, Inc.*, 172 N.C. App. 281, 288, 616 S.E.2d 349, 354 (2005). Here, there is ample evidence in the record to support the court's finding that each individual furthered a single concerted plan with Zee to solicit GE customers for Zee's enrichment. Though individual defendants contend the Chem-Aqua allegations cannot support a finding of concerted action by individual defendants, there is ample evidence irrespective of Chem-Aqua to show sufficient concerted action to hold individual defendants jointly and severally liable. Because the trial court properly found that individual defendants acted in concert to harm GE, joint and several liability was appropriate. As such, we affirm the trial court's judgment with regard to joint and several liability and section 75-1.1 liability.

### III. DISCUSSION OF ZEE COMPANY, INC.'S APPEAL

#### A. Rule 37 Sanctions and Compensatory Damages

**[15]** Zee first argues that the trial court erred by allowing GE to use Zee's gross sales to the carve-outs as its measure of compensatory damages rather than Zee's net profits, because the changed measure of damages as a discovery sanction is not authorized by Rule 37 of the North Carolina Rules of Civil Procedure. We disagree.

Rule 37 of the North Carolina Rules of Civil Procedure confers power on trial judges to impose sanctions that "prevent or eliminate dilatory tactics on the part of unscrupulous attorneys or litigants." *Essex Grp., Inc. v. Express Wire Servs., Inc.*, 157 N.C. App. 360, 363, 578 S.E.2d 705,

707 (2003). Sanctions for failing to obey a discovery order are within the sound discretion of the trial court and will not be overturned on appeal absent a showing of abuse of that discretion. *In re Estate of Johnson*, 205 N.C. App. 641, 644, 697 S.E.2d 365, 367 (2010). "A trial court does not abuse its discretion by imposing a severe sanction so long as that sanction is 'among those expressly authorized by statute' and there is no 'specific evidence of injustice.' " *Batlle v. Sabates*, 198 N.C. App. 407, 417, 681 S.E.2d 788, 795 (2009) (citation omitted); *see also Martin v. Solon Automated Servs., Inc.*, 84 N.C. App. 197, 201, 352 S.E.2d 278, 281 (1987) ("Even though the [Rule 37] sanctions imposed were somewhat severe, they were among those expressly authorized by the statute; thus, we cannot hold that they constitute an abuse of discretion absent specific evidence of injustice caused thereby.").

The subsection of Rule 37 which authorized the trial court to sanction Zee reads:

> (b)(2) Sanctions by Court in Which Action Is Pending. If a party . . . fails to obey an order to provide or permit discovery . . . a judge of the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
>
> . . .
>
> b. An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting the party from introducing designated matters in evidence[.]

N.C. Gen. Stat. § 1A-1, Rule 37(b)(2)(b) (2011).

Zee conceded at oral argument that its behavior during trial warranted sanctions of some kind. Indeed, the record is rife with Zee's efforts to evade GE's requests for evidence of net profits made on sales to the carve-outs, including contravention of three separate orders to compel over a span of two years. Zee's failure to obey these orders justified the trial court's decision to impose sanctions. *See McCraw v. Hamrick*, 88 N.C. App. 391, 394, 363 S.E.2d 201, 202 (1988) (noting that Rule 37 allows trial courts to enter orders to compel and sanction failure to comply with such orders).

GE was entitled to recover as damages either its lost profits or the profits garnered by Zee, and it elected to disgorge Zee of its profits. *See Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 659-61, 670 S.E.2d 321, 329-30 (2009) (setting damages for violation of section 75-1.1

premised on misappropriation of trade secrets as "the greater of the extent to which plaintiff has suffered economic loss or the extent to which the competitor has unjustly benefitted" and remanding for measure of profits where revenue alone was "too speculative to constitute a proper measure of damages"). However, contrary to Zee's characterization, the sanction imposed by the trial court did not impermissibly transform the measure of damages from profit to revenue. Rather, the court availed itself of Rule 37(b)(2)(b) by considering GE's evidence of the unfair benefit Zee generated from these transactions and keeping out any conflicting evidence that may have been offered by Zee. The trial court ordered that:

> 2. Plaintiff shall be permitted to offer evidence of Zee Company, Inc.'s gross sales as the basis of Plaintiff's damages in this action.
>
> 3. Samuel Harper and Barry Owings hereby are prohibited from offering testimonial or other evidence concerning Zee's damages in this action.
>
> 4. Zee hereby is prohibited from offering any evidence in support of its damages in this action . . . .

Although the court allowed GE to submit evidence of revenue as the "basis" of the measure of damages, it did not order that revenue displace profits in general as the target measurement. Profit is "[t]he excess of revenues over expenditures in a business transaction." Black's Law Dictionary 1329 (Ninth ed. 2009). Without evidence of expenditures, the court used what figures it had to determine the improper benefit Zee gained from the transactions with the carve-outs. This sanction was permissible because "the fact finder in [an] unfair and deceptive trade [sic.] practices claim[] has broad discretion in awarding damages to insure that the plaintiff is made whole and the wrongdoer does not profit from its conduct." *TradeWinds Airlines, Inc. v. C-S Aviation Servs.*, __ N.C. App. __, __, 733 S.E.2d 162, 174 (2012). Zee conceded at oral argument that GE incurred loss as a direct result of Zee's sales to the carve-outs. Based on Zee's admitted, obstinate refusal to provide evidence on its net profits, we find that any lesser sanction would not have been sufficient to insure that Zee did not profit from its misconduct.

This sanction was explicitly authorized under Rule 37(b)(2)(b), and because Zee concedes that it was enriched at GE's expense and its behavior during discovery was deviant enough to warrant punishment, we find that there is no evidence of injustice which may otherwise support a finding that the trial court abused its discretion by prohibiting

Zee from submitting evidence of the measure of damages. *See Martin*, 84 N.C. App. at 201, 352 S.E.2d at 281. We therefore affirm the court's sanction and judgment as to this matter.

## B. Punitive Damages

**[16]** Zee next argues that the trial court erred by entering punitive damages that violate N.C. Gen. Stat. § 1D-25, are unconstitutionally excessive, and impermissibly punish Zee for out-of-state conduct. We find that the punitive damages were entered in contravention of North Carolina Supreme Court precedent, and therefore we must reverse and remand.

This Court reviews application of the punitive damages limits in N.C. Gen. Stat. § 1D-25 *de novo. Bodine v. Harris Vill. Prop. Owners Ass'n, Inc.*, 207 N.C. App. 52, 59, 699 S.E.2d 129, 134 (2010). " 'Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632-33, 669 S.E.2d 290, 294 (2008) (quoting *In re Appeal of the Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

The statute that imposes limitations on punitive damages awards provides that:

> (b) Punitive damages awarded *against a defendant* shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater. If a trier of fact returns a verdict for punitive damages in excess of the maximum amount specified under this subsection, the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount.

N.C. Gen. Stat. § 1D-25(b) (2011) (emphasis added).

On appeal, Zee argues that the entry of punitive damages against each defendant individually was impermissible given our Supreme Court's interpretation of section 1D-25(b) in *Rhyne v. K-Mart Corp.*, 358 N.C. 160, 594 S.E.2d 1 (2004). We agree. The defendant in Rhyne argued, as GE does here, that the plain language of section 1D-25(b) ("[p]unitive damages against *a defendant* shall not exceed . . . ") requires the application of its limits to each defendant, not each plaintiff. *Rhyne*, 358 N.C. at 187-88, 594 S.E.2d at 19. However, by interpreting that provision in the context of the entire statute, our Supreme Court held that the legislature's intent was to "reduce each plaintiff's individual punitive damages award." *Id.* at 188, 594 S.E.2d at 20.

**GE BETZ, INC. v. CONRAD**

[231 N.C. App. 214 (2013)]

> This construction of section 1D–25(b) is further supported
> by the operation of other statutes within Chapter 1D. Most
> significantly, section 1D–15(a) directs the trier of fact to
> consider an exclusive list of aggravating factors when
> determining whether to award punitive damages. N.C.G.S.
> § 1D–15(a). *In the absence of some legislative directive,*
> *it is assumed that the trier of fact should, as it did at*
> *common law, consider these factors as to each plaintiff's*
> *cause of action and not as to each defendant.* It follows
> that, like section 1D–15(a), section 1D–25(b) applies to
> the individual jury verdict of each plaintiff.

*Id.* at 189, S.E.2d at 20 (emphasis added). It is undisputed that the
trial court here made factual findings pursuant to the provisions within
Chapter 1D as to each individual defendant in analyzing whether punitive
damages should be awarded. The trial court then concluded that each
defendant had engaged in conduct sufficient to warrant punitive
damages and entered $864,891.00 (three times the compensatory
damages amount of $288,297.00) against each defendant individually.
Based on the Supreme Court's holding in *Rhyne*, this was an erroneous
application of sections 1D-25(b), because the trial court as the finder
of fact considered factors not as to "each plaintiff's cause of action"
but as to each defendant. *Id.* We must therefore reverse the trial court's
judgment and remand for reentry of punitive damages in light of that and
now this decision. *See Musi v. Town of Shallotte,* 200 N.C. App. 379, 383,
684 S.E.2d 892, 896 (2009) ("[T]his Court has no authority to overrule
decisions of our Supreme Court and we have the responsibility to
follow those decisions until otherwise ordered by the Supreme Court.")
(citation and quotation marks omitted).

**[17]** Zee also argues that the trial court violated its due process rights
by awarding punitive damages against Zee for harm that it allegedly
caused to Chem-Aqua, an out-of-state company which was not a party to
this case. The United States Supreme Court has held "the Due Process
Clause forbids a State to use a punitive damages award to punish a
defendant for injury that it inflicts on nonparties." *Philip Morris USA*
*v. Williams,* 549 U.S. 346, 353, 166 L. Ed. 2d 940, 948 (2007). Furthermore,
the Supreme Court has noted "as a general rule, a [s]tate [does not] have
a legitimate concern in imposing punitive damages to punish a defen-
dant for unlawful acts committed outside of the [s]tate's jurisdiction."
*State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 421, 155 L. Ed.
2d 585, 600 (2003). In assessing punitive damages, the trial court found
as fact that "[t]he acts of Zee pertaining to the Chem-Aqua incident

demonstrate that Zee was engaging in similar if not identical conduct that it engaged in against GE." It is unclear from the court's conclusions how much weight, if any, it gave to the Chem-Aqua allegations in entering the maximum amount of punitive damages. However, to ensure that Zee's constitutional rights were not violated, we remand to the trial court for new findings of fact and conclusions of law relating to punitive damages that give no consideration to Zee's out-of-state conduct toward Chem-Aqua, a nonparty to the suit.

Finally, Zee argues that the aggregate amount of punitive damages in this case was unconstitutionally excessive. Because the court initially awarded punitive damages on a per-defendant rather than per-plaintiff basis and improperly conducted its statutory inquiry into whether punitive damages were warranted, we decline to reach this issue, as it involves matters which may not recur following the court's actions on remand. *See Few v. Hammack Enterprises, Inc.*, 132 N.C. App. 291, 299, 511 S.E.2d 665, 671 (1999) (declining to consider the remaining contentions "as they may not recur on remand").

## C. Attorneys' Fees

[18] Zee's final argument on appeal is that the $5.77 million award of attorneys' fees was unreasonable and the court abused its discretion by awarding GE fees related to Zee's counterclaims. We affirm the award of fees based on Zee's counterclaims, but remand for new findings as to the reasonableness of the award.

This Court reviews an award of attorneys' fees for abuse of discretion. *Blankenship v. Town & Country Ford, Inc.*, 174 N.C. App. 764, 771, 622 S.E.2d 638, 643 (2005). "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision." *Stilwell v. Gust*, 148 N.C. App. 128, 130, 557 S.E.2d 627, 629 (2001) (citation omitted). In order to determine whether the trial court has abused its discretion, we consider whether there is competent evidence to support the court's findings and whether those findings support the court's conclusions. *Dyer v. State*, 331 N.C. 374, 376, 416 S.E.2d 1, 2 (1992).

Generally, a successful litigant may not recover attorneys' fees unless such recovery is expressly authorized by statute. *Hicks v. Albertson*, 284 N.C. 236, 238, 200 S.E.2d 40, 42 (1973). Here, the court awarded attorneys' fees incurred on GE's claims pursuant to N.C. Gen. Stat. §§ 75-16.1(1), 66-154(d), and 1D-45; it also awarded attorneys' fees on Zee's counterclaims pursuant to N.C. Gen. Stat. §§ 75-16.1(2) and 6-21.5. Zee does not argue that the trial court erred by awarding fees to

GE based on GE's claims; rather, it argues that the court erred by award-
ing fees based on Zee's counterclaims and that the total attorneys' fees
amount was unreasonable. We hold that the court did not err by award-
ing fees on Zee's counterclaims, but we remand to the trial court for a
redetermination of the reasonableness of the total fee award.

Under section 75-16.1(2), a trial court may award attorneys' fees to
a defending party where "the party instituting the action knew, or should
have known, the action was frivolous and malicious." N.C. Gen. Stat.
§ 75-16.1(2) (2011). Section 6-21.5 requires a finding that there was "a
complete absence of a justiciable issue of either law or fact raised by
the losing party." N.C. Gen. Stat. § 6-21.5 (2011). Zee argues that its coun-
terclaims were not "frivolous and malicious" and contained justiciable
issues of law, and therefore the court could not meet the requirements
of awarding fees under these statutes.

Zee cites *Free Spirit Aviation, Inc. v. Rutherford Airport Auth.*,
206 N.C. App. 192, 200, 696 S.E.2d 559, 565 (2010) for the proposition
that "a claim that survives a motion for summary judgment, by defini-
tion, does not lack justiciability." However, Zee overlooks the actual
holding of *Free Spirit*: "We need not address whether fees are always
precluded after a denial of summary judgment because . . . the trial court
did not err in denying defendants' motion for attorneys' fees under N.C.
Gen. Stat. § 6–21.5." *Id.* at 201, 696 S.E.2d at 565. Here, the trial court
granted summary judgment in favor of GE on all of Zee's counterclaims
for tortious interference except as to one customer – Global Nuclear
Fuels ("GNF") – as to which GE did not seek summary judgment.

Zee contended that GE tortiously interfered with contracts or pro-
spective economic advantages it may have had with two carve-outs,
GNF and Shamrock, and by doing so violated the unfair or deceptive
practices act. However, the trial court correctly concluded that: (1) Zee
had no right to conduct business with those companies in the first place,
because doing so would breach individual defendants' employment
contracts, but in the alternative, (2) Zee put forth no evidence which
tended to show that any behavior on GE's part interfered with any
relationship Zee may have had with GNF or Shamrock, and therefore
(3) Zee presented no evidence which supported the conclusion that GE
participated in unfair or deceptive practices. Because Zee "persisted in
litigating the case after a point where [it] should reasonably have become
aware that the pleading [Zee] filed no longer contained a justiciable
issue," *Sunamerica Financial Corp. v. Bonham*, 328 N.C. 254, 258, 400
S.E.2d 435, 438 (1991), due to the lack of credible evidence implicating
GE, we affirm the court's fee awards under section 6-21.5. Therefore,

we need not address the court's alternate conclusion that Zee's counterclaims were frivolous and malicious under section 75-16.1 or 1D-45.

**[19]** After concluding that it is statutorily authorized to award attorneys' fees, the trial court must make findings regarding the reasonableness of the award. *United Laboratories, Inc. v. Kuykendall*, 335 N.C. 183, 195, 437 S.E.2d 374, 381-82 (1993). Among the aspects of representation that the trial court may consider in assessing reasonableness are:

> the time and labor expended, the skill required, the customary fee for like work, [] the experience or ability of the attorney . . . the novelty and difficulty of the questions of law[,] the adequacy of the representation[,] the difficulty of the problems faced by the attorney[,] especially any unusual difficulties[,] and the kind of case for which fees are sought and the result obtained.

*Id.* (citation and quotation marks omitted).

We find no relevant North Carolina statute that guides our assessment of "customary fees for like work," and our appellate courts have not had occasion to decide whether fees must be awarded in light of the rates typically charged in the geographic region where the litigation takes place. However, this Court has previously recognized the general principle that community rates in the geographic area of the litigation are relevant to the reasonableness determination. *See Okwara v. Dillard Dep't Stores, Inc.*, 136 N.C. App. 587, 594, 525 S.E.2d 481, 486 (2000) (allowing the Court to look at "the customary fee for similar work in the community" in a civil rights case) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)); *see also Whiteside Estates, Inc., v. Highlands Cove, L.L.C.*, 146 N.C. App. 449, 468, 553 S.E.2d 431, 444 (2001) (affirming rates as reasonable where the record showed they were "within the range of such fees and charges customarily charged in the community," among other things). The Fourth Circuit has also held that the community where the court sits is "the appropriate starting point for selecting the proper rate." *Nat'l Wildlife Fed'n v. Hanson*, 859 F.2d 313, 317 (4th Cir. 1988). The *Hanson* court held that although community rates may be the starting point, the trial court must conduct further inquiry when local counsel do not have the expertise to adequately represent a client. *Id.* In assessing reasonableness of fees incurred by more expensive out-of-state counsel, the court asks two questions as to reasonableness: (1) "are services of like quality truly available in the locality where the services are rendered"; and (2) "did the party choosing the attorney from elsewhere act reasonably in making that choice [to

hire non-local counsel]?" *Id.* (quoting *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768 (7th Cir. 1982)).

We are not bound by the *Hanson* court's ruling, but we find its analysis addressing the reasonableness of awarding unusually high fees in the community where the litigation took place to be persuasive. *See Soderlund v. Kuch*, 143 N.C. App. 361, 370, 546 S.E.2d 632, 638 (2001) ("[W]ith the exception of the United States Supreme Court, federal appellate decisions are not binding upon either the appellate or trial courts of this State.") (citation and quotation marks omitted); *Shepard v. Ocwen Fed. Bank, FSB*, 172 N.C. App. 475, 479, 617 S.E.2d 61, 64 (2005) ("Although we are not bound by federal case law, we may find their analysis and holdings persuasive.") However, we decline to adopt a test that forces courts to assess the reasonableness of a litigant's decision to hire counsel generally. Parties, including GE, are free to hire as counsel whomever they wish at whatever rates they are willing to pay. The issue is whether the fees awarded against an adverse party are reasonable, not whether it was reasonable for those fees to be incurred by the prevailing party. *See Cotton v. Stanley*, 94 N.C. App. 367, 369, 380 S.E.2d 419, 421 (1989) ("Once the court decides to award attorneys' fees, however, it must award reasonable attorneys' fees.").

Here, the trial court set out detailed findings of fact regarding the reasonableness of awarding the attorneys' fee, including the customary fees for like work. However, the court declined to consider whether Paul Hastings' fees should be adjusted in light of those typically charged in North Carolina.[7] The court made the following relevant findings of fact regarding the reasonableness of Paul Hastings' fees:

> 45. Here, the circumstances, complexity and nature of the case support GE's decision to utilize Paul Hastings as its legal counsel. Ward and Smith is a highly capable and qualified law firm. However, Ward and Smith had no prior working relationship with GE and no prior familiarity with the Employment Agreements at issue.

> 46. Paul Hastings has represented GE and its affiliates and subsidiaries for approximately 30 years and maintains a GE client service team, of which Victoria Cundiff is a member. When this dispute first arose, GE enlisted the

---

7. Specifically, the trial court stated: "Defendants contend the hourly rates charged by Paul Hastings must be reduced to the rates customarily charged by North Carolina attorneys in the community in which this case has been litigated and tried. The [c]ourt disagrees."

GE BETZ, INC. v. CONRAD

[231 N.C. App. 214 (2013)]

assistance of its longstanding counsel, Paul Hastings, and Ms. Cundiff and other members of her team reviewed and analyzed the Employment Agreements and became familiar with the structure, business, and business challenges then facing GE. Ms. Cundiff also was personally involved in GE's efforts over the course of several months to avoid litigation prior to the institution of this lawsuit.

47. Members of Paul Hastings' team prepared drafts of the initial pleadings and initial discovery requests based on their prior knowledge and experience. Paul Hastings also utilized this knowledge and its longstanding relationship with GE to work with Ward and Smith[.]

. . .

49. In the Fall of 2009, when the case was set for trial, Paul Hastings worked with Ward and Smith to prepare for the multitude of depositions scheduled during the month of October 2009. Thereafter, while the Ward and Smith attorneys prepared for, appeared and argued in Court, Paul Hastings worked with witnesses and engaged in other trial preparation activities. The Court finds that both firms' involvement was appropriate in order to prepare for the February 2010 trial.

We agree that GE's hiring of Paul Hastings to perform work related to this litigation was reasonable, but that does not complete our inquiry. In assessing the reasonableness of awarding Paul Hastings' fees against Zee, we will consider whether "services of like quality [were] truly available in the locality where the services are rendered." *Hanson*, 859 F.2d at 317. It appears that much of the work performed by Paul Hastings' attorneys could have just as effectively been performed by local counsel at local rates. The trial court did not attempt to make this distinction. The record reveals that Paul Hastings' attorneys billed at rates typical of New York firms, which were significantly higher than their North Carolina counterparts at Ward and Smith. For example, the rates billed by Paul Hastings' and Ward and Smith's lead attorneys at the outset of the litigation were $633.25 and $270.00 per hour, respectively. Because of that disparity, over $3 million of the $5,769,903.10 attorneys' fee award against Zee was billed by Paul Hastings, despite the fact that no counsel for Paul Hastings ever appeared before a court in North Carolina throughout the entirety of the litigation. Furthermore, in April 2007, associate attorneys at Paul Hastings charged $500.00 per hour

– double the $250.00 fee charged by attorneys at Ward and Smith – for "factual investigation and development; obtaining and analyzing [c]lient documents; [and] interview[ing] witnesses". These duties clearly did not require a prior relationship or intimate knowledge of GE's employment contracts, because GE paid the attorneys at Ward and Smith to perform almost identical work during the same time period.

We find it unreasonable to force Zee to pay a fee that includes rates double those billed in the community where the litigation took place for work that seemingly did not require such a premium. Ultimately, GE's willingness to pay significantly higher rates for work that they could have procured for much less does not necessitate a finding that those fees are reasonable when awarded against Zee. Rather, the court must make additional findings which demonstrate why awarding such unusually high fees in the community where the litigation took place is reasonable. *See Inst. Food House, Inc. v. Circus Hall of Cream, Inc.*, 107 N.C. App. 552, 558, 421 S.E.2d 370, 374 (1992) ("[R]easonableness is the key factor under all attorney's fees statutes.").

Accordingly, we find that the trial court abused its discretion by awarding the entire fee billed by Paul Hastings against Zee without conducting any inquiry as to which of the services rendered by Paul Hastings' attorneys truly could not have been performed by local counsel at reasonable rates within the community in which the litigation took place. Therefore, we remand for further findings as to this distinction.

## IV. DISCUSSION OF ADDITIONAL APPELLANTS' APPEAL

### A. Criminal Contempt

[20] Additional appellants' first argument on appeal is that the trial court erred by failing to follow the proper safeguards in finding Almy in criminal contempt of court. We agree.

"The standard of review for contempt proceedings is limited to determining whether there is competent evidence to support the findings of fact and whether the findings support the conclusions of law." *Watson v. Watson*, 187 N.C. App. 55, 64, 652 S.E.2d 310, 317 (2007). "Findings of fact made by the judge in contempt proceedings are conclusive on appeal when supported by any competent evidence and are reviewable only for the purpose of passing upon their sufficiency to warrant the judgment." *Hartsell v. Hartsell*, 99 N.C. App. 380, 385, 393 S.E.2d 570, 573 (1990), *disc. review denied*, 362 N.C. 373, 662 S.E.2d 551 (2008); *see also State v. Simon*, 185 N.C. App. 247, 250, 648 S.E.2d 853, 855, (applying a similar standard of review for review of criminal contempt).

There are two kinds of contempt — civil and criminal. *O'Briant v. O'Briant*, 313 N.C. 432, 434, 329 S.E.2d 370, 372 (1985). "A major factor in determining whether contempt is civil or criminal is the purpose for which the power is exercised." *Id.*

> Criminal contempt is generally applied where the judgment is in punishment of an act already accomplished, tending to interfere with the administration of justice. Civil contempt is a term applied where the proceeding is had to preserve the rights of private parties and to compel obedience to orders and decrees made for the benefit of such parties.

*Id.* (citation and quotation marks omitted).

Criminal contempt is further categorized as either direct or indirect criminal contempt. Criminal contempt is direct when the act: (1) is committed within the sight or hearing of the presiding judge, (2) is committed in or near the room where proceedings are being held before the judge, or (3) is likely to interfere with matters before the court. *Id.* at 435-36, 329 S.E.2d at 373; N.C. Gen. Stat. § 5A-13(a) (2011). "Any criminal contempt other than direct criminal contempt is indirect criminal contempt and is punishable only after proceedings in accordance with the procedure required by [N.C. Gen. Stat. §] 5A-15." N.C. Gen. Stat. § 5A-13(b) (2011). Because criminal contempt is a crime, constitutional safeguards are triggered and proper procedure must be followed. *Watson*, 187 N.C. App. at 61, 652 S.E.2d at 315. The procedural requirements of section 5A-15 include, *inter alia*, (1) the trial court giving notice to the accused in the form of "an order directing the person to appear before a judge at a reasonable time specified in the order and show cause why he should not be held in contempt of court"; and (2) establishing facts "beyond a reasonable doubt" that support a judgment of guilt. N.C. Gen. Stat. § 5A-15(a), (f) (2011).

GE tries to dispute that Almy was held in criminal contempt. It argues that the trial court did not avail itself of N.C. Gen. Stat. § 5A-1, which prescribes rules and procedures for criminal contempt, but rather utilized its "inherent authority" to issue contempt as a discovery sanction beyond the express language of Rule 37.

However, during the hearing on GE's motion to sanction additional appellants and hold them in contempt, GE's counsel stated "in this case, Your Honor, it would not be civil contempt, it would have to be criminal contempt . . . ." GE's counsel then stated that GE was seeking "statutory criminal contempt" under "North Carolina General Statute 5A-11." GE

was seeking to hold additional appellants in contempt based on their previous bad acts – the disclosures of confidential documents. Because "[a] major factor in determining whether contempt is criminal or civil is the purpose for which the power is exercised," and "[c]riminal contempt is generally applied where the judgment is in punishment of an act already accomplished," *O'Briant*, 313 N.C. at 434, 319 S.E.2d at 372, it follows that GE must have necessarily been seeking criminal contempt by punishing Almy and Dombroff for their violations of the protective order. Furthermore, the order itself stated that "publication of Exhibit 20 by Almy in violation of [the protective order] constitutes criminal contempt." In light of the above, it is clear that Almy was held in indirect criminal contempt based on his prior actions. *See* N.C. Gen. Stat. § 5A-13(b) (2011) ("Any criminal contempt other than direct criminal contempt is indirect criminal contempt . . . .").

Because Almy was held in indirect criminal contempt, the trial court was required to follow the procedures set out in section 5A-15, which it failed to do. The trial court did not provide Almy with "an order directing [him] to appear before a judge at a reasonable time specified in the order and show cause why he should not be held in contempt of court." N.C. Gen. Stat. § 5A-15(a) (2011). The only communication between the trial court and Almy after GE's motion and before the hearing was an email setting a date for the hearing.

Furthermore, the order did not set out facts established "beyond a reasonable doubt," nor did it indicate that a reasonable doubt standard was applied. N.C. Gen. Stat. § 5A-15(f) (2011). "Failure to make such an indication is fatally deficient, unless the proceeding is of a limited instance where there were no factual determinations for the court to make." *State v. Ford*, 164 N.C. App. 566, 571, 596 S.E.2d 846, 850 (2004); *see also In re Contempt Proceedings Against Cogdell*, 183 N.C. App. 286, 289, 644 S.E.2d 261, 263 (2007) (reversing a court order without remand where the trial court failed to indicate that the reasonable doubt standard was used in a criminal contempt proceeding). Here, because a hearing was held for the court to make factual determinations, the failure to indicate that the reasonable doubt standard was used renders the order fatally deficient.

Therefore, because Almy was held in indirect criminal contempt and the trial court failed to follow the procedures provided by section 5A-15, we reverse the trial court's judgment without remand. Accordingly, we need not address whether the $500.00 imposed on Almy as part of the criminal contempt sanction was permissible.

## B. Attorneys' Fees

**[21]** Additional appellants' second argument on appeal is that the trial court erred in ordering that Almy pay GE's attorneys' fees incurred in the sanction proceedings under Rule 37(b)(2).[8] We agree.

"A trial court's award of sanctions under Rule 37 will not be over-turned on appeal absent an abuse of discretion." *Graham v. Rogers*, 121 N.C. App. 460, 465, 466 S.E.2d 290, 294 (1996). Rule 37(b)(2) states that "[i]n lieu of any of the foregoing orders or in addition thereto, the court shall require *the party failing to obey the order* to pay the reasonable expenses, including attorney's fees, caused by the failure . . . ." N.C. Gen. Stat. § 1A-1 Rule 37(b)(2) (2011) (emphasis added).

At issue here is whether an attorney constitutes a "party" for the pur-poses of awarding attorneys' fees under Rule 37(b)(2). An often-applied rule of construction is that "where a statute is intelligible without any additional words, no additional words may be supplied." *State v. Camp*, 286 N.C. 148, 151, 209 S.E.2d 754, 756 (1974). Although this Court has not analyzed whether the word "party" in Rule 37(b)(2) includes attorneys, we held in *First Mt. Vernon Indus. Loan Ass'n v. ProDev XXII, LLC*, 209 N.C. App. 126, 134, 703 S.E.2d 836, 841 (2011) that "Rule 37(a) dem-onstrates . . . that the General Assembly has purposefully distinguished between parties and non-parties." The *First Mt. Vernon* Court held that a non-party could not be subject to sanctions under Rule 37(d), and therefore, the trial court erred by taxing attorneys' fees and costs on the non-party where the statute explicitly applied to "the *party* failing to act." *Id.* at 134, 703 S.E.2d at 841. Rules 37(b)(2) and 37(d) contain almost identical provisions setting out the individuals who are bound by them. Both apply to "a party or an officer, director, or managing agent of a party or a person designated under Rule 30(b)(6) or 31(a) to testify on behalf of a party." N.C. Gen. Stat. §§ 1A-1, Rule 37(b)(2), (d) (2011). Here, Almy was not a party to the underlying actions, nor was he an offi-cer, director, managing agent, or designee to testify on behalf of a party.

Because the language of Rule 37(b)(2) is intelligible without add-ing anything further, and because the reasoning of the *First Mt. Vernon* Court applies to Rule 37(b)(2) given its similarity to Rule 37(d), we find that it was error for the court to award GE attorneys' fees against Almy because he was not a "party" to the suit under the language of the Rule authorizing fees. Accordingly, we reverse the award of attorneys' fees against Almy.

---

8. The trial court did not award GE attorneys' fees against Dombroff.

## C. Revocation of *Pro Hac Vice* Admissions

[22] Additional appellants' final argument on appeal is that the trial court erred by revoking their admissions *pro hac vice* to represent defendants in the action against GE. The court's order revoking additional appellants' admissions reads in its entirety, "The Court summarily revokes the pro hac vice admissions of Attorney Mark A. Dombroff and Attorney Thomas B Almy." The court made no independent findings of fact or conclusions of law supporting its order, but it did enter the order after conducting a hearing on GE's motion for sanctions.

Permission to practice in this state *pro hac vice* may be revoked by the trial court "on its own motion and in its discretion." N.C. Gen. Stat. § 84-4.2 (2011). "This status is . . . not a right but a discretionary privilege." *Sisk v. Transylvania Cmty. Hosp., Inc.*, 364 N.C. 172, 178-79, 695 S.E.2d 429, 434 (2010) (citation and quotation marks omitted).

First, as to Almy, we find that our decision setting aside his being held in criminal contempt is significant enough to remand to the trial court for a new determination as to whether his admission *pro hac vice* should have been revoked. Conviction for a crime showing "professional unfitness" is a statutory ground for disbarment in North Carolina. N.C. Gen. Stat. § 84-28(b)(1), (c) (2011). As such, Almy's being held in criminal contempt likely affected the trial court's decision to revoke his admission. Because we reverse the order holding Almy in criminal contempt, we remand with instruction that the trial court afford no weight to that crime when reconsidering whether to revoke his *pro hac vice* admission.

[23] As to Dombroff, additional appellants argue that the trial court abused its discretion by revoking his admission because the $1,000 fine imposed by a federal court in 1997 was not the type of "discipline" that needed to be disclosed under N.C. Gen. Stat. § 84-4.1 (2011). Section 84-4.1(6) requires any attorney seeking admission to practice in this state *pro hac vice* to provide "[a] statement accurately disclosing a record of all that attorney's disciplinary history. Discipline shall include (i) public discipline by any court or lawyer regulatory organization, and (ii) revocation of any pro hac vice admission." N.C. Gen. Stat. § 84-4.1 (2011). Additional appellants cite to a public announcement on the North Carolina State Bar website, wherein it defines the types of "disciplinary" proceeding that it prosecutes, and explains that it deals with disciplinary matters which implicate a lawyer's license to practice law. However, based on the plain language of section 84-4.1, attorneys are required to disclose discipline administered by both courts and lawyer

regulatory organizations such as the State Bar. We hold that the court did not abuse its discretion by revoking the *pro hac vice* admission of Dombroff because he violated section 84-4.1 by failing to disclose a $1,000 disciplinary fine levied against him by the United States District Court for the District of South Carolina, and the court's decision was therefore supported by reason. *See White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985) ("A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason . . . [or] upon a showing that [the trial court's decision] was so arbitrary that it could not have been the result of a reasoned decision.")

## V. CONCLUSION

Because the trial court correctly interpreted "indirect solicitation" and "supervisory responsibility" in individual defendants' employment contracts, GE presented sufficient evidence to show individual defendants breached the confidentiality provisions in the employment contracts, and GE was not equitably estopped from penalizing Lukowski for breaching his contract, we affirm the trial court's judgment as to individual defendants' employment agreements. Additionally, because GE sufficiently established causation independent of evidence that GE lost customers for other reasons, we affirm the trial court's exclusion of that evidence. Finally, because GE sufficiently identified the misappropriated trade secrets, and individual defendants acted in concert, we affirm the trial court's ruling that joint and several liability and section 75-1.1 liability were appropriate. Thus, we affirm the trial court as to all issues on individual defendants' appeal.

As to Zee's appeal, we find that the trial court did not impermissibly change the measure of damages as a Rule 37 sanction. However, we do find that the entry of punitive damages against each defendant individually was in error given the Supreme Court's ruling in *Rhyne*, and that the trial court's assessment of attorneys' fees did not consider whether the fees billed by Paul Hastings attorneys were reasonable in the context of the community in which the action was litigated. Therefore, we affirm the trial court's measure of compensatory damages and remand as to the issues of punitive damages and attorneys' fees.

Finally, because the trial court did not follow the proper statutory procedures in holding Almy in criminal contempt of court, that order must be reversed and will not be remanded for further proceedings. *See Cogdell*, 183 N.C. App. at 290, 644 S.E.2d at 264 (reversing the court's judgment without remand where it failed to indicate that the reasonable doubt standard was used in a criminal contempt proceeding).

Accordingly, we remand for a redetermination as to Almy's *pro hac vice* revocation in light of this decision. We find that the court did not abuse its discretion in revoking the admission *pro hac vice* of Dombroff, because the discipline that he withheld from the trial court fell under the definition of the term as it is used in section 84-4.1.

AFFIRMED in part, REVERSED in part, and REMANDED in part.

Judges BRYANT and STEELMAN concur.