Safety Test & Equip. Co., Inc. v. Am. Safety Util. Corp., 2015 NCBC 37.

STATE OF NORTH CAROLINA

COUNTY OF CLEVELAND

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 1037

SAFETY TEST & EQUIPMENT
COMPANY, INC.,

        Plaintiff,

    v.

AMERICAN SAFETY UTILITY
CORPORATION; CHARLES R.
PRICE; CHARLES A. PRICE; JOHN
E. HAMRICK; CHRISTOPHER T.
MCMAHAN; and THOMAS M.
CURRY III,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ORDER & OPINION

{1}     THIS MATTER is before the Court on Defendants' Motion for Summary Judgment ("Motion"), made pursuant to Rule 56(c) of the North Carolina Rules of Civil Procedure ("Rule(s)").  Having considered the Motion, affidavits, supporting briefs, and attached exhibits, as well as arguments of counsel, the Motion is GRANTED in part and DENIED in part.

> *Enns & Archer LLP by Rodrick J. Enns and Robinson Law Office by J. Neil Robinson for Plaintiff.*
>
> *Hedrick Gardner Kincheloe & Garofalo, LLP by J. Douglas Grimes for Defendants.*

Gale, Chief Judge.

## I.     INTRODUCTION

{2}     Plaintiff Safety Test & Equipment Company, Inc. ("Safety Test") and Defendant American Safety Utility Corporation ("ASUC") are competitors.  Safety Test brings this action to redress what it contends were unlawful actions that

ASUC and its owners, Charles R. Price ("Buddy Price") and Charles A. Price ("Andy Price"), undertook to secure competitive gains by hiring Safety Test's former employees, John E. Hamrick ("J. Hamrick"), Christopher T. McMahan ("McMahan"), and Thomas M. Curry ("Curry") (collectively, "Departing Employees"), and inducing them to misappropriate Safety Test's legally protected information to achieve unfair and unlawful competitive gains.

{3} Safety Test did not have employment agreements or restrictive covenants with the Departing Employees. Safety Test did distribute an employee manual, written receipt of which was acknowledged by the Departing Employees, which included obligations to protect Safety Test's confidential information. Instead of pursuing contract claims based on this manual, Safety Test relies on allegations of trade secret misappropriation, which it asserts gives rise to further claims for unfair and deceptive trade practices ("UDTP") and civil conspiracy because of the manner in which the Defendants cooperated to achieve their purposes. Safety Test also contends that all Defendants except Curry tortiously interfered with its prospective contractual relations.

{4} Defendants now move for summary judgment on all claims, asserting that Safety Test is improperly using trade secret claims to excuse its failure to obtain adequate contractual protection. Defendants contend that the trade secret claims fail as a matter of law because Safety Test has not identified any alleged trade secrets with sufficient specificity, and that, in any event, any information it has or might have specified does not qualify as a trade secret because it derives no commercial value from not being generally known, is readily ascertainable, and was not subject to reasonable efforts to guard its secrecy. Defendants also assert that, even assuming Plaintiff has trade secrets in the claimed categories, there is no evidence that supports a finding that Defendants misappropriated any trade secrets. Finally, Defendants contend that all other claims should be dismissed because they depend upon the trade secret claims, which fail.

## II.    PROCEDURAL HISTORY

{5}    Safety Test initiated this action on June 12, 2013, alleging claims for misappropriation of trade secrets, defamation, tortious interference with prospective contract, civil conspiracy, and UDTP.  The case was assigned to the undersigned as a complex business dispute on June 19, 2013.

{6}    Plaintiff voluntarily dismissed its defamation claim on February 19, 2014.

{7}    The claims arose when the Departing Employees left employment with Safety Test at different times to join ASUC and involve actions the Departing Employees allegedly took both before and after leaving Safety Test.  Safety Test asserts that ASUC, Buddy Price, and Andy Price induced the Departing Employees to breach their obligation to protect Safety Test's confidential information, and that all Defendants collectively and cooperatively misappropriated Safety Test's trade secrets consisting of the following categories of information: (1) confidential supplier pricing; (2) a confidential strategy of creating a network of specialized product and component suppliers and manufacturing products in-house, at significant cost savings ("OEM sourcing");[1] (3) historical customer pricing; and (4) specific customer needs and requirements.[2]

{8}    Defendants filed their Motion on September 11, 2014, following the close of all discovery, and seek summary judgment against Plaintiff on all claims.

{9}    The Motion has been fully briefed and argued, and it is ripe for disposition.

---

[1] "OEM" is short for original equipment manufacturer.

[2] Safety Test describes aspects of its manufacturing and assembly systems and its customer truck kits as "specific examples of how Safety Test's confidential cost, sourcing, and customer needs information are used by Safety Test in combination to achieve several competitive advantages," but it does not delineate these systems or kits as independent trade secrets.  (Pl. Resp. Opp'n Defs.' Mot. Summ. J. 37.)  Therefore, the Court does not independently evaluate whether this information qualifies for trade secret protection.

## III.    FACTUAL BACKGROUND

{10}    The Court does not make findings of fact when ruling on a motion for summary judgment. *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975).  The following summarizes facts or inferences that the Court believes the record supports and that are material to evaluating the Motion.

### A. <u>Safety Test, ASUC, Its Owners, and the Departing Employees</u>

{11}    Safety Test was founded in the 1960s to provide government-regulated testing for equipment used in constructing, maintaining, and repairing electrical power generation and distribution systems.  Safety Test also distributes protective clothing, equipment, and tools used in servicing electrical and power generation systems.  Safety Test and ASUC compete in these fields.  Drew A. Beam ("Beam") is the current president of Safety Test.  In 1982, Safety Test's then-vice president, Defendant Buddy Price, left Safety Test to found Defendant ASUC.  Buddy Price owns ASUC with his son, Andy Price.

{12}    J. Hamrick and McMahan both worked for Safety Test in sales.  J. Hamrick joined Safety Test in 1998 and eventually became its Outside Sales Manager.  McMahan began working for Safety Test in 2006.  McMahan and J. Hamrick were assigned specific customer accounts for which they were responsible and received a commission on sales to those customers.

{13}    Curry began working for Safety Test in 2005 as a repair technician and was eventually promoted to manager of Safety Test's tool assembly and repair services department.  He received training from Richard Rindone, Safety Test's vice president, in "[g]rounding, mechanical bypass jumper assemblies," which included "the use of d[i]es and equipment, and the procedure configuration of parts specific to the customer's requirements."  (Rindone Dep. 67:5–13, 68:1–3, June 27, 2014.)  Curry testified that, apart from ensuring that the tools he repaired worked properly, he was not privy to any customers' repair needs or preferences.  (Curry Dep. 17:7–18, July 23, 2014.)  His duties consisted of hand-writing work orders,

including the parts and the labor for each task, and submitting work orders to the salesmen for pricing. The record indicates that Curry rarely knew the ultimate cost to customers for his repair services.

{14} Safety Test had no comprehensive employment agreements with the Departing Employees. However, each signed a Receipt & Acknowledgement of Safety Test Employee Manual ("Acknowledgement"), which stated:

> I am aware that during the course of my employment confidential information will be made available to me, i.e., [sic] product designs, marketing strategies, customer lists, pricing policies and other related information. I understand that this information is critical to the success of Safety Test and must not be given out or used outside of Safety Test's premises or with non-Safety Test employees. In the event of termination of employment, whether voluntary or involuntary, I hereby agree not to utilize or exploit this information with any other individual or company.

(Green Aff. Exs. A, B.) The Employee Manual does not further define "confidential information." The manual also states that an employee is expected to maintain confidentiality even after leaving Safety Test and may later be required to sign a confidentiality agreement to that effect. (Green Aff. Ex. B 23–24.)

{15} The Departing Employees did not agree to other restrictive covenants that might contractually prohibit competition, or solicitation of employees or customers.

### B. Safety Test's Business Practices

{16} Safety Test alleges that it has developed proprietary means for providing better value to customers at a lower cost. For example, Safety Test asserts that it negotiates favorable pricing from its suppliers by contracting to purchase many products over a long period of time, asking a supplier to beat another supplier's price, and requesting that suppliers provide a lower price for a specific transaction. While admitting that the general methods for acquiring this pricing may not be secret, Safety Test claims that it and many of its suppliers considered certain pricing confidential, and that, as a result, knowledge of such pricing is commercially valuable to a competitor because it is not generally known

or readily ascertainable.  This is particularly true in regard to a compilation of historical pricing.  Safety Test has offered testimony that it keeps detailed records of its costs and margins for products sold to customers.  Safety Test does not have a set formula for determining prices that its salesmen quote to customers.  (Safety Test 30(b)(6) Dep. 197:14–:20, Aug. 4, 2014.)  Rather, sales representatives determine what the customer will pay and what competitors are offering on a case-by-case basis.  (Lindsay Hamrick ("L. Hamrick") Dep. 14:2–15:24, Sept. 10, 2013.)  Product availability and the relationship between sales representative and customer also factor into pricing.  (Murphy Dep. 149:18–:24, June 25, 2014.)  Consequently, prices that Safety Test quotes to its customers can vary.

{17}    As to its claim regarding OEM sourcing, Safety Test contends that it has developed  a confidential process, including supplier sourcing and special pricing with regard to certain OEM items.  It claims that it would be particularly difficult, if not impossible, for Defendants to replicate this process and pricing without unlawful misappropriation.  While Safety Test acknowledges that it generally distributes components and products it receives from its suppliers, it asserts that it also assembles certain products itself, as a result of which it is able to deliver those products at significant cost savings.  To achieve this advantage, it must carefully select and guard those suppliers who are willing to furnish the necessary component parts or specialized finished products.  Through this negotiated OEM sourcing, Safety Test is able to price its products more competitively.  Although Plaintiff acknowledges its OEM sources may be well-known suppliers, it asserts that their "capability and willingness to provide" products to Plaintiff, as well as the specifics of what was provided to Plaintiff and at what cost, is confidential.  (Pl.'s Supplemental Answers to Defs.' First Set Interrogs. ("Pl. Supplemental Interrogs. Resps.") – AEO No. 3(B).)  Safety Test discovered its OEM sources' "capability and willingness" to provide products to a distributor in various ways, including through professional contacts.  (Safety Test 30(b)(6) Dep. 224:22–:24, 225:19–:21, 235:8–237:2, 237:12–:15, 237:23–239:17, 240:4–241:17, 242:12–243:5, 243:12–:14.)

{18}  The record is less than clear as to whether Safety Test and the OEM sources understood that the various pricing details were to be treated as confidential, and the steps Safety Test took to maintain all the details of their relationships with OEM sources as confidential.  It is also unclear from the present record whether a particular supplier would have refused to reveal pricing had any Safety Test competitor known to ask.  The record does include evidence that Safety Test took measures to guard against disclosing the identity of its OEM sources.  For example, while sales manager at Safety Test, J. Hamrick sent an e-mail to staff directing that, when a shipment from one of the OEM sources arrived at Safety Test, all identifying labels were to be removed from the carton before it was discarded, to "enable Safety Test to keep any advantages we have worked hard to gain, within the company." (Third L. Hamrick Aff. Ex. C.)

{19}  In regard to its claim regarding particularized customer needs, Safety Test has offered testimony that its sales representatives have developed familiarity with customers' "specific . . . needs, budget requirements, testing requirements, contract requirements, and tooling standardization." (Pl. Supplemental Interrogs. Resps. No. 3(I).)  For a specific example, Plaintiff points to its Duke Energy account. Duke Energy has an in-house maintenance department and field maintenance personnel, both of which need parts, supplies, and tools from Safety Test.  Safety Test required the lead on the account to make weekly site visits, develop familiarity with each site's and technician's needs, master the field purchasing agents' ordering preferences, track the separate written purchase orders within Duke Energy, and process all orders in time for delivery during the next week's site visit. (Rindone Aff. ¶ 13.)  When he left Safety Test, J. Hamrick was the lead on the Duke Energy account, having assumed responsibility for the account only after Rindone prepared him for four months. (Rindone Aff. ¶ 15.)

{20}  Safety Test points to record evidence that it took certain measures to protect the confidentiality of its claimed secrets in order to maintain its market advantage.  As mentioned, each employee signs an Acknowledgment, agreeing not to disclose "designs, marketing strategies, customer lists, pricing policies, and other

related information." (Green Aff. Ex. B.) Internal documents containing sensitive information were not, however, consistently marked as confidential or as trade secrets. (Green Dep. 96:7–97:1.) There is contested evidence that Safety Test kept its physical premises secure, including that during operating hours, all outside doors were kept locked and that after hours, doors were locked, an alarm system was activated, and the facilities were protected by video surveillance. (*But see* Curry Dep. 19:18–20:10 (testifying that Safety Test's doors were not locked on weekends and that truckers and customers would enter the premises on weekends).)

{21} As further support for its assertion that it has maintained the secrecy of its supplier prices, OEM sources, and customer costs and margins, Safety Test testifies that this information is stored on a password-protected computer network with limited access. At the same time, the record suggests that most Safety Test employees have access to the network that allows them to see suppliers, OEM sources, costs of products, as well as customer purchase orders and cost history (Rindone Dep. 166:5–167:24; 170:17–25, June 27, 2014; Murphy Dep. 71:17–72:16, June 25, 2014)), and that the only employees without access to the system were individuals who constructed grounding assemblies, worked on a bench repairing hoist, or were "[t]emporary kids brought in to be menial workers." (Rindone Dep. 169:19–25.) Safety Test has confidentiality agreements with some, but not all, of its customers and vendors regarding pricing.

## C. Departing Employees' Negotiations with ASUC While Employed by Safety Test

{22} While still working at Safety Test, McMahan e-mailed Andy Price "a list of contractors in NC that [he] currently [took] care of," in apparent anticipation of bringing some of them over to ASUC. (Pl. Resp. Opp'n Defs.' Mot. Summ. J. ("Pl. Opp'n Br.") App. Part 4, at 21.) After starting at ASUC, McMahan contacted at least five of those customers and received new or increased business from them as a

result.  (*Compare* Pl. Opp'n Br. App. Part 4, at 21 *with* ASUC 30(b)(6) Dep. by McMahan 8:20–9:17, Aug. 19, 2014.)

{23}   In negotiating his employment with ASUC, J. Hamrick requested that, once at ASUC, he be permitted to continue to service ASUC customers with whom he formed a relationship while at Safety Test.  (J. Hamrick Dep. 201:11–202:11, June 20, 2014.)  Accordingly, J. Hamrick e-mailed ASUC's president a list of eleven Safety Test customers he wanted to continue serving at ASUC.  (Pl. Opp'n Br. App. 4, p. 36.)  Andy Price testified that ASUC wanted Hamrick to call on these eleven customers and to generate or increase sales for ASUC from those customers.  (Charles A. Price Dep. 132:5–133:12, June 18, 2014.)

{24}   ASUC also attempted to recruit J. Hamrick's brother, Lindsay Hamrick ("L. Hamrick"), away from Safety Test.  One of the Prices informed L. Hamrick that ASUC did not know "how to do th[e] stuff" that Safety Test did.  (L. Hamrick Third Aff. ¶ 15.)  The Prices also asked how many customers L. Hamrick believed he could bring with him to ASUC.  (L. Hamrick Third Aff. ¶ 16.)  Ultimately, L. Hamrick did not leave Safety Test.

### D.  Departing Employees Leave Safety Test for ASUC

{25}   McMahan left Safety Test to join ASUC in July 2011.  Approximately nine months later, J. Hamrick resigned from Safety Test and signed an employment agreement with ASUC later the same day.  Curry terminated his employment with Safety Test on November 16, 2012, and began working for ASUC on December 10, 2012, as a tool repair worker.  In May 2013, Curry was promoted to interim supervisor of ASUC's repair department.

{26}   When leaving Safety Test, J. Hamrick retained an e-mail communication with a supplier and a historical income statement covering the past twenty years, including profits, costs of goods sold, and overhead.[3]  (*See* Defs.' Resp.

---

[3] Safety Test also contends that J. Hamrick retained a customer quotation and that McMahan made a copy of his entire hard drive on his company-issued laptop, subsequently wiping the laptop clean before returning it to Safety Test.  However, the cited materials either do not support Safety Test's assertions or are not attached to any of the appendices submitted for the Court's consideration.

Pl.'s First Set Interrogs. and Reqs. Produc. Docs. No. 28; Pl. Opp'n Br. App. Part 1, at 23–25, 28.) When Curry left Safety Test, he took three aprons that he had a Safety Test employee make with materials he purchased himself. (Curry Dep. 24:13–25:20.) Curry testified that he only used these aprons for a personal hobby and not at ASUC. (Curry Dep. 25:21–26:4.) There is no evidence to the contrary.

{27} Plaintiff contends that, after McMahan and J. Hamrick began working at ASUC, the company contacted specific suppliers requesting pricing similar to Safety Test's. Safety Test has identified these suppliers pursuant to the confidentiality order entered in this case. (Pl. Supplemental Interrogs. Resps. No. 3.) Safety Test contends that each of these suppliers either were unknown to ASUC prior to hiring the Departing Employees or that ASUC has no other way of knowing that they provided specific products and components at specific prices to Safety Test. (Pl. Supplemental Interrogs. Resps. No. 3.)

{28} Safety Test contends that two days after McMahan began his employment with ASUC, ASUC's purchasing manager, Joshua Wolma, e-mailed a representative of one of Safety Test's suppliers inviting him to visit ASUC because it had "some new opportunities." (Hospers Dep. Ex. 2, Aug. 20, 2014.) Wolma later e-mailed this supplier requesting product prices that were virtually identical to prices Safety Test had negotiated for those products. (Hospers Dep. 27:24–30:16.) The supplier and Safety Test had not expressly agreed that this pricing was confidential, but Safety Test contends that the information was not generally known. (Hospers Dep. 28:25–29:3.) The supplier did not ultimately provide ASUC the products at the requested prices. (Hospers Dep. 31:17–:24, 32:9–:23.)

{29} Safety Test contends that Andy Price and Wolma informed another of Plaintiff's suppliers that McMahan compared ASUC's pricing with Safety Test's pricing and, based on the difference, ASUC wanted better pricing "on a couple things." (Baker Dep. 29:11–30:23, Aug. 18, 2014.) Safety Test claims that ASUC had unsuccessfully requested better pricing on these products from this supplier for years, but had never been able to provide "competitive information" to support its request. (Baker Dep. 30:8–:23.) Based on the competitive information ASUC

offered, the supplier gave ASUC slightly better pricing on certain items but did not give the full discount requested. (Baker Dep. 30:18–:23.)

{30} Safety Test asserts that it sells a specialty cable known as its "Richard Rindone Cable," and that J. Hamrick contacted Safety Test's supplier to place an order for a virtually identical cable. (Baker Dep. 56:5–58:15.) Beam testified that its supplier does not sell the specialty cable to anyone else. (Safety Test 30(b)(6) Dep. by Beam. 230:25–231:15, Aug. 4, 2014.) Safety Test developed the specifications for the Richard Rindone Cable but does not claim a patent or copyright interest in it. (Safety Test 30(b)(6) Dep. by Beam. 231:17–233:5.) The supplier ultimately declined to sell the specialized cable to ASUC. (J. Hamrick Dep. 262:9–:25, June 20, 2014.)

{31} Safety Test references efforts by McMahan and J. Hamrick to contact Safety Test's OEM sources on ASUC's behalf to request pricing on supplies. Plaintiff contends that McMahan used confidential knowledge to place an order with an OEM source who manufactured grounding cable. McMahan contends that he did not use confidential information from Safety Test to reach out to the OEM source but rather found the company through an internet search. (McMahan Dep. 163:25–164:2, June 19, 2014.) However, McMahan then placed the orders under Safety Test's name and had them sent to ASUC. (McMahan Dep. 163:1–:18, June 19, 2014.) J. Hamrick assisted ASUC in contacting another OEM source to order dies. J. Hamrick learned of this source from a customer's suggestion while he was at Safety Test. (J. Hamrick Dep. 138:10–:21, June 20, 2014.)

{32} Curry also contacted a supplier he learned about through his employment at Safety Test. (Curry Dep. 34:20–35:3.) At Curry's request, the supplier provided two flat-top tables for ASUC's facility. The tables were of a "standard design with nothing special about [them]." (Nance Aff. ¶ 6.)

{33} Safety Test also contends that Defendants poached several of its customers after hiring its employees. Specifically, Safety Test asserts that McMahan and J. Hamrick contacted many of their former customers and encouraged them to move some or all of their business to ASUC, which those

customers, in large part, did. (ASUC 30(b)(6) by J. Hamrick 13:14–:18, 16:8–:11, 19:19–:22, 24:3–:16, 26:15–:19, 31:5–:11, 34:8–36:2, 32:30–:23; *see e.g.*, ASUC 30(b)(6) by McMahan 9:18–11:1.) Shortly after joining ASUC, J. Hamrick informed his contacts at Duke Energy that he had changed employment, was working at ASUC, and would like to continue doing business with that account. (ASUC 30(b)(6) Dep. by J. Hamrick 14:15–15:19.) Duke Energy subsequently increased its existing business with ASUC. (ASUC 30(b)(6) Dep. by J. Hamrick 15:20–16:7.)

{34} McMahan and J. Hamrick serviced twenty-five customers at Safety Test whom they later contacted on behalf of ASUC. (*See* ASUC 30(b)(6) Dep. by J. Hamrick 201:11–202:11; ASUC 30(b)(6) Dep. by McMahan 8:20–9:17.) Many of these customers generated or increased business with ASUC after J. Hamrick and McMahan began employment with ASUC. ASUC sold products to ten of those twenty-five customers for prices slightly lower than those Safety Test previously quoted, on at least nineteen occasions. (Pl. Opp'n Br. App. Part 1, Ex. 1.) For example, J. Hamrick sold a product to a customer on behalf of Safety Test just before leaving the company; he sold the same product to the same customer on behalf of ASUC two months later for two cents less than the Safety Test price. (Pl. Opp'n Br. App. Part 1, Ex. 1.)

## IV.    STANDARD OF REVIEW

{35} On summary judgment, the trial court asks "whether, on the basis of materials supplied . . . there was a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law." *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003). The moving party must demonstrate that absence of any triable issue of fact. *Garner v. Rentenbach Constructors, Inc.*, 350 N.C. 567, 572, 515 S.E.2d 438, 441 (1999). The materials supplied to the trial court must be viewed in the light most favorable to the nonmoving party. *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 695, 682 S.E.2d 726, 733 (2009).

# V. ANALYSIS

## A. Safety Test Has Developed an Adequate Record to Pursue Certain of its Trade Secret Claims at Trial Against Defendants Other Than Curry

{36} Safety Test would unquestionably be in a stronger position to recover for its loss of employees and customers if it had utilized various contractual agreements designed to avoid or minimize such losses. Trade secret claims have a heightened burden of proof and are not intended as substitutes for other recognized contract or tort claims. However, an employee left free to compete with a former employer, unburdened by restrictive covenants, nonetheless must abide by statutory protections afforded trade secrets. The question the Motion presents is whether Safety Test has adequately presented or forecast an evidentiary basis to meet its statutory burden to show (1) that Safety Test has developed and guarded particular information that has commercial value from not being generally known or readily ascertainable through independent development in the competitive marketplace and (2) that Defendants have separately or collectively misappropriated such information.

{37} The case against Curry is significantly different. The tortious interference claim is not asserted against him. The Court has carefully examined the trade secret misappropriation, civil conspiracy, and UDTP claims against Curry, who Plaintiff does not contend was involved in the various sales activities in which the other Defendants are supposed to have engaged. Plaintiff alleges that Curry was privy to and misappropriated its trade secret information in its OEM sourcing program, customer and supplier pricing, and customer needs and requirements. (Compl. ¶¶ 17, 34–35.) This misappropriation, Plaintiff contends, forms a basis for its civil conspiracy and UDTP claims against Curry. However, record support for these allegations against Curry is lacking. In summary, Plaintiff bases its case against Curry on the following: (1) at Safety Test, he was trained in "[g]rounding, mechanical bypass jumper assemblies," which included "the use of d[i]es and equipment, [and] the procedure configuration of parts specific to the customer's requirements" (Rindone Dep. 67:5–13, 68:1–3, June 27, 2014); (2) while still

employed at Safety Test, he asked an employee to make him three aprons from materials he purchased which he took with him upon departing from Safety Test; (3) after beginning work at ASUC, Curry contacted one of Safety Test's OEM suppliers requesting certain items, some of which the supplier declined to provide and two of which were flat-top tables of standard design that the supplier did provide to ASUC. The Court concludes that Plaintiff has not established a case against Curry that survives summary judgment. Curry is therefore entitled to have all claims against him dismissed.

{38}    Other Defendants have developed strong defenses that may ultimately prevail. The record includes evidence upon which the fact finder could conclude either that the disputed information does not qualify for trade secret protection or that Defendants did not actually misappropriate such information. The present Motion asks the Court only to determine whether Safety Test has forecast sufficient evidence such that a finder of fact could conclude that Defendants have misappropriated one or more trade secrets and not to rule upon the strengths of Defendants' defense.

{39}    The Court must make inferences in Safety Test's favor to resolve that question. Having, in some instances, been required to employ such favorable inferences from a marginally developed record, the Court concludes first that there are material issues of disputed fact that preclude summary judgment as to three of the four categories of information in which Safety Test claims trade secrets.

{40}    Before separately analyzing each of the four categories from which Safety Test's claims arise, the Court summarizes general legal principles that must guide the analysis as to each category.

{41}    It is elementary that Safety Test must adequately identify the information it alleges constitutes trade secrets to pursue its misappropriation claims. A trade secret is

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that: (a) derives independent actual or potential commercial value from not being generally known or readily

ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3) (2014).

{42} To determine whether information meets this definition, the trial court considers the following factors: (1) whether the information is known outside of the business; (2) whether it is known to employees and others involved in the business; (3) the measures taken to guard the information's secrecy; (4) the information's value to the business and its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which others could acquire or duplicate the information. *Area Landscaping, LLC v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 525, 586 S.E.2d 507, 511, (2003) (citing *Wilmington Star-News v. New Hanover Reg'l Med. Ctr.*, 125 N.C. App. 174, 180–81, 480 S.E.2d 53, 56 (1997)).

{43} A plaintiff may not rest only on generalized allegations. "[A] plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether misappropriation has or is threatened to occur." *Analog Devices v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003). This "sufficient particularity" standard "does not require a party to 'define every minute detail of its trade secret down to the finest detail.'" *DSM Dyneema, LLC v. Thagard*, 2014 NCBC LEXIS 51, at *18 (N.C. Super. Ct. Oct. 17, 2014) (quoting *Prolifiq Software, Inc. v. Veeva Sys., Inc.*, No. C 13-03644SI, 2014 U.S. Dist. LEXIS 77493, *5 (N.D. Cal. June 4, 2014)).

{44} A plaintiff must also demonstrate that information is of actual or commercial value, is not "generally known or readily ascertainable," and is subject to reasonable efforts to maintain its secrecy. N.C. Gen. Stat. § 66-152(3); *see also Area Landscaping*, 160 N.C. App. at 525, 586 S.E.2d at 511. No trade secret will be found if the information is publicly available or there is no evidence indicating that the plaintiff undertook efforts to ensure the information's secrecy. *Bank Travel*

*Bank v. McCoy*, 802 F. Supp. 1358, 1360 (E.D.N.C. 1992) (indicating, absent reasonable security measures, a trade secret cannot exist).

{45} Consequently, compilations comprised solely of publicly available information are generally not recognized as trade secrets. *See Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 370–71, 555 S.E.2d 634, 640 (2001) (citing *Glaxo Inc. v. Novopharm Ltd.*, 931 F. Supp. 1280 (E.D.N.C. 1996), *aff'd*, 110 F.3d 1562 (4th Cir. 1997)). A compilation of publicly available information may, however, receive trade secret protection where the claimant encountered some difficulty in assembling each of the public components. *SCR-Tech LLC v. Evonik Energy Servs., LLC*, 2011 NCBC LEXIS 27, at *47 (N.C. Super Ct. July 22, 2011) ("[A] process comprised of published components turns on how easy or difficult it is to assemble the relevant elements into the secret combination." (internal quotations omitted)). To qualify for trade secret protection, any such compilation must have independent commercial value to the claimant and be subject to reasonable efforts to maintain its secrecy. *Market Am., Inc. v. Rossi*, No. 1:97CV00891, 1999 U.S. Dist. LEXIS 9793, at *43 (M.D.N.C. Apr. 15, 1999).

{46} For example, claiming secrecy in a compilation of prices quoted to customers requires clear focus on efforts a business took to protect that information. Where a plaintiff does not restrict a customer's further distribution of pricing information provided to the customer and acknowledges the customer's right to use that information, the pricing is not entitled to trade secret protection. *Area Landscaping*, 160 N.C. App. at 526, 586 S.E.2d at 511–12. However, the same information can be protected as a trade secret where the claimant has undertaken efforts to closely guard the information which, if known, would provide a significant advantage to a competitor. *Byrd's Lawn & Landscaping, Inc. v. Smith,* 142 N.C. App. 371, 375–77, 542 S.E.2d 689, 692–93 (2001). The inquiry must be as to specific facts which vary from case to case. Generally, however, where cost information remains confidential and derives commercial value from that confidentiality, it may constitute a trade secret. *GE Betz, Inc. v. Conrad*, ___ N.C. App. ___, 752 S.E.2d 634, 649 (2013), *writ denied, review denied*, 766 S.E.2d 837 (2014).

{47}     Even if information was initially secret and the claimant intended that trade secret information be confidential, trade secret protection can be lost if adequate measures were not taken to insure that the information was, in fact, kept confidential. Maintaining password protection for a computerized database is one such measure, but without other demonstrated efforts may not be adequate to meet the obligations imposed by the North Carolina Trade Secrets Protection Act ("Trade Secrets Act"). *McKee v. James*, 2013 NCBC LEXIS 33, at *38–39 (N.C. Super. Ct. July 24, 2013). The North Carolina Court of Appeals has suggested that a password-protected database should limit access to top-level employees. *TSG Finishing, LLC v. Bollinger*, ___ N.C. App. ___, 767 S.E.2d 870, 877 (2014) (noting that plaintiff's computers were password-protected with additional passwords required to access production information) (holding that "[s]ecurity measures were in place such that only top-level employees were familiar with the proprietary information defendant was in charge of developing").

{48}     Finally, once a plaintiff has demonstrated that it has a trade secret, it must also present "substantial evidence" of misappropriation, that is, that defendants "(1) [k]now[] or should have known of the trade secret; and (2) [have] had a specific opportunity to acquire it for disclosure or use or [have] acquired, disclosed, or used it without the express or implied consent or authority of the owner." N.C. Gen. Stat. § 66-155. The North Carolina Court of Appeals has stated a requirement that, in addition to describing a trade secret with sufficient particularity, a claimant must also identify the actual acts of misappropriation with adequate specificity. *Washburn v. Yadkin Valley Bank & Trust Co.*, 190 N.C. App. 315, 327, 660 S.E.2d 577, 585–86 (2008) (dismissing trade secret claim because the plaintiff did not "identify with sufficient specificity either the trade secrets . . . or the acts by which the alleged misappropriations were accomplished"). More generally stated, a plaintiff must enable the Court "to determine whether misappropriation has or is threatened to occur." *Analog Devices*, 157 N.C. App. at

468, 579 S.E.2d at 453.[4]  Once a plaintiff satisfies its burden in this regard, Defendants may elect to defend by introducing "substantial evidence" that they "acquired the information comprising the trade secret by independent development, reverse engineering, or . . . from another person with a right to disclose the trade secret."  N.C. Gen. Stat. § 66-155.

{49}    The Court now turns to its consideration of the four separate categories of information Safety Test seeks to protect, applying these general principles.

### i.  Supplier Pricing

{50}    Safety Test claims a trade secret in its compilation of cost history records, which demonstrates the favorable pricing it has received and continues to receive from suppliers as a result of contracting to purchase many products over a long period of time, including the ability to ask a supplier to beat or match another supplier's price or to tailor pricing for a specific transaction.  Defendants assert that Plaintiff has not sufficiently identified the information it seeks to protect, but even if it has, such information cannot be protected as a trade secret.

{51}    Safety Test identified thirty-six specific, major brand suppliers who give Safety Test "better pricing than that reflected in such suppliers' published or customary distributor price lists."  (Pl. Supplemental Interrogs. Resps. – AEO No. 3(A).)  Safety Test has also pointed to several e-mail communications with suppliers memorializing its negotiations with these suppliers for special pricing.  The Court concludes that this listing is made with sufficient particularity to advise Defendants as to the claims against which they must defend.  *See GE Betz*, ___ N.C. App. at ___, 752 S.E.2d at 649; *Analog Devices*, 157 N.C. App. at 468, 579 S.E.2d at 453.

{52}    The Court further concludes that Safety Test has made an adequate forecast of evidence upon which a jury could determine that this historical

---

[4] Safety Test has not invited the Court to pursue any reasoning based on "inevitable disclosure."  *See FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477 (W.D.N.C. 1995).   Rather, here, there is a record of competition between the parties, and the issue is whether specific known acts in the course of that competition rise to the level of misappropriation.

compilation of information has independent actual or potential competitive value from not being generally known or readily ascertainable. Making inferences in Safety Test's favor, it enjoys a competitive advantage from the information's confidentiality, because its competitors continue to pay higher supplier prices requiring higher customer charges, which narrows their profit margins. The Court reaches these conclusions recognizing that Safety Test must ultimately overcome substantive hurdles to prove that the information it seeks to protect is not generally known or readily ascertainable. As noted, however, cases have recognized the fact that "similar information may have been ascertainable by anyone in the [same] business," does not, alone, preclude trade secret protection. *Byrd's Lawn & Landscaping*, 142 N.C. App. at 376, 542 S.E.2d at 692. There may be protected value in the historical compilation of information upon an adequate showing that the information is not easily acquired or cannot be easily assembled in the same fashion. *Id.*

{53} The Court finds that it cannot draw the distinction at the summary judgment stage. There is contested evidence from which a jury might find a distinction between generally available pricing and the special pricing Safety Test obtains from the thirty-six major suppliers it has specified. Defendants' own e-mails may constitute evidence that the specifics of Safety Test's special pricing was not generally known. For example, one of ASUC's and Safety Test's common suppliers testified that Andy Price asked him for a better price on certain items after McMahan joined the company and was able specifically to compare the supplier's pricing between Safety Test and ASUC. (Baker Dep. 29:11–30:23.) Previously, ASUC had unsuccessfully requested better pricing but was not able to provide specifics as to the supplier's pricing to a competitor. (Baker Dep. 30:8–23.) ASUC secured better pricing because it was able to confront the supplier with the prices offered to Safety Test. (Baker Dep. 30:18–23.)

{54} Even assuming the pricing would otherwise qualify as a trade secret, Safety Test ultimately must overcome hurdles in proving it has taken adequate measures to protect its information. A jury may be particularly troubled by Safety

Test's failure to obtain restrictive covenants from its employees. But, the ultimate resolution of whether Safety Test has met its burden of proof depends upon contested material facts, again precluding summary resolution of the issue. The Court concludes that Safety Test has demonstrated a record at least strong enough to survive summary judgment. The record demonstrates a combination of efforts, including that Safety Test locks its facilities and monitors them through video surveillance during nonbusiness hours; it has a password-protected database that contains supplier pricing information; it executes written confidentiality agreements with some suppliers; and through its employees' Acknowledgment, it secured a contractual commitment to protect confidential information. Defendants seek to rebut these facts, noting that password access to Safety Test's computer database is freely given, and that Safety Test had the opportunity to but did not obtain contractual protections from its employees, does not have a separate actual written agreement as to confidential information beyond its Employee Manual, and deals with many suppliers for which it does not maintain confidentiality agreements. But again, a jury must resolve the contested facts.

{55} In sum, the Court finds that Safety Test has developed a record or has forecast sufficient evidence adequate to survive summary judgment on its claims of misappropriation of its supplier pricing as against Defendants other than Curry.

### ii. OEM Sourcing

{56} As to this category of information, Safety Test identifies its claimed trade secret as a

> confidential strategy of identifying and developing relationships with original equipment manufacturers, contract engineers, metal fabricating companies, forging operations, plastic injection or molding companies, and other alternative sources, who would design and supply to Safety Test unbranded or private label products and components of equal or superior quality to those . . . offered by the major brand suppliers that customarily served the industry, but at significant cost savings to Safety Test.

(Pl. Supplemental Interrogs. Resps. – AEO No. 3(B).)  Safety Test adds that "[t]he mere identity of these suppliers by itself was not confidential, but their capability and willingness to provide the items identified on an OEM or private label basis, as well as the specifics of what was supplied to Safety Test and it what cost [sic], was confidential to Safety Test."  (Pl. Supplemental Interrogs. Resps. – AEO No. 3(B).)

{57}    Defendants counter that Plaintiff's OEM sourcing cannot qualify as a trade secret, even if otherwise secret, because it was developed in the normal course of Safety Test's business, without special efforts.  They rely heavily on a prior Business Court decision, which found on its particular record that no trade secret should be found where there was no evidence that the claimant "expended any significant amount of effort or money in developing the information, outside of the cost of doing business." *Edgewater Servs., Inc. v. Epic Logistics, Inc.*, 2009 NCBC LEXIS 21, at \*14 (N.C. Super. Ct. Aug. 11, 2009), *aff'd* 217 N.C. App. 399, 720 S.E.2d 30 (2011) (summary judgment against misappropriation claim where "the information that makes up Plaintiffs' alleged trade secrets [was] information . . . compiled in the course of doing business").

{58}    However, here there is evidence upon which a finding could be made that Safety Test developed its OEM sourcing process and pricing *outside* the course of doing its normal business.  Safety Test identified a process by which it either arranges for suppliers to manufacture private label products to Safety Test's specifications or requests components not typically sold to distributors in this industry and then assembles those components into a finished product that it can sell to customers at significant cost savings.

{59}    Looking to authority from a sister jurisdiction, Defendants assert that "material sources and costs are something that would be learned in any productive industry." *Tyson Metal Prods., Inc. v. McCann*, 546 A.2d 119, 122 (Pa. Super. Ct. 1988) (quoting *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1257 (3rd Cir. 2985)) (internal quotation marks omitted).  They then argue that once a supplier is generally known, getting the further information is simply a matter of calling the source.  Some evidence suggests, however, that the information was not so easily

available from Safety Test's sources. There is evidence that ASUC ordered components from Safety Test's OEM sources only after J. Hamrick and McMahan began working there and that ASUC had not previously known of the sources' willingness to provide products of the nature sold to Safety Test. (*See, e.g.*, Pl. Supplemental Interrogs Resps. No. 3(J)(4) (describing McMahan ordering the same OEM grounding cable at same price on behalf of ASUC).) Safety Test has developed evidence that only certain suppliers would sell it finished products subject to its specifications or components used to make an end product that it could sell itself.

{60} An additional inference as to the confidentiality of this information may arise from the manner in which ASUC tried to access Safety Test's OEM sources. While McMahan contends that he did not use Safety Test's confidential information to reach out to an OEM source but found the company through an internet search (McMahan Dep. 163:25–164:2, June 19, 2014), he actually ordered the products under Safety Test's name and had them sent to ASUC. (McMahan Dep. 163:1–:18, June 19, 2014.) J. Hamrick assisted ASUC in contacting another OEM source he learned of at Safety Test to order dies. (J. Hamrick Dep. 138:10–:21, June 20, 2014.)

{61} For this category of information, the same material issues of fact noted above regarding the measures Safety Test took to protect the secrecy of its information must be determined at trial, not summary judgment. As to OEM sourcing in particular, while at Safety Test, J. Hamrick directed staff that when a shipment from an OEM supplier arrived at Safety Test, all identifying labels were to be removed from the carton before it was discarded, in order to "enable Safety Test to keep any advantages we have worked hard to gain, within the company." (Third L. Hamrick Aff. Ex. C.)

{62} Safety Test has forecasted evidence that certain Defendants have actually or potentially misappropriated information regarding Safety Test's OEM sourcing. Evidence includes several of Defendants' unsuccessful attempts to replicate Safety Test's OEM sourcing strategy. For instance, Defendants contacted two separate Safety Test suppliers requesting they provide certain fixtures and

private label cables to ASUC. (Nance Aff. ¶¶ 3–4; Baker Dep. 56:5–58:15.) Ultimately, both suppliers declined to provide the requested items to ASUC. (Nance Aff. ¶ 5; J. Hamrick Dep. 262:9–:25.) There is evidence that Defendants succeeded in purchasing certain grounding cables from one of Safety Test's OEM suppliers. (McMahan Dep. 163:1–164:2; Pl. Supplemental Interrogs. Resps. No. 3(J)(4).)

{63} In sum, the Court concludes that there are material issues of fact which preclude summary adjudication regarding the claimed trade secret misappropriation of Safety's Test OEM sourcing as to all Defendants other than Curry.

### iii. Historical Customer Pricing

{64} The Court interprets Safety Test's alleged trade secret in this category to be its compilation of historical prices offered to customers. The Court is not allowing a more generalized trade secret claim in all customer pricing. While the Court has struggled, it concludes that this claimed trade secret in historical pricing survives summary judgment.

{65} Safety Test admits that its individual sales representatives determine the prices they quote to customers and that it does not have any formula for setting customer pricing. (Safety Test 30(b)(6) Dep. 197:14–:20.) The record suggests that customer pricing is based entirely on the cost of getting materials from the supplier, competitors' prices, what the customer is willing to pay, and the profit that Safety Test hopes to make on the product. (Safety Test 30(b)(6) Dep. 83:23–84:25; L. Hamrick Dep. 14:2–15:24, Sept. 10, 2013.) It seems clear that the general use of these factors to set pricing on a case-by-case basis is standard industry practice.

{66} Even within the narrow category of historical competition, Defendants assert that Safety Test's claimed trade secrets must fail for lack of specificity, citing to this Court's prior holding that a plaintiff who claimed trade secret protection in "proprietary formulas, methodologies, customer and pricing data and other confidential information" failed to identify trade secrets. *Akzo Nobel Coatings, Inc.*

*v. Rogers*, 2011 NCBC LEXIS 42, at \*68–69 (N.C. Super. Ct. Nov. 3, 2011).  Safety Test responds that its claim, at least as to the historical compilation, is more comparable to that allowed in *Byrd's Lawn & Landscaping*.  142 N.C. App. at 376, 542 S.E.2d at 692.  The Court concludes that Safety Test's claim is sufficiently comparable to *Byrd's Lawn & Landscaping* to withstand summary judgment on a claim that it lacks adequate specificity.

{67}    Safety Test contends that it has developed evidence that its cost history records have commercial value, evidenced by Defendants' use of those records to outbid Safety Test by narrow margins.  Defendants counter with the general assertion that Safety Test's historical pricing has no value, given that pricing frequently fluctuates and quickly becomes stale and of no value.  (Safety Test 30(b)(6) Dep. 194:12–:25.)  But, if historical information enhances "the ability to predict a competitor's bid with reasonable accuracy," it may have commercial value.  *Byrd's Lawn & Landscaping*, 142 N.C. App. at 375, 542 S.E.2d at 692 (quoting *Black, Sivalls & Bryson, Inc. v. Keystone Steel Fabrication, Inc.*, 584 F.2d 946, 952 (10th Cir. 1978)).

{68}    As to misappropriation, the facts are contested, but Safety Test has developed some evidence from which it might be found that ASUC used Safety Test's historical costs records to its advantage.  For example, an e-mail from Andy Price to a supplier states that "[n]ow that [J. Hamrick] and [McMahan] are here and we know everything Safety Test is doing we are way off on . . . pricing to be competitive."  (Pl. Opp'n Br. App. Part 4, at 26.)  Safety Test points to evidence that ASUC underpriced Safety Test by a small margin on nineteen occasions shortly after J. Hamrick and McMahan joined its ranks.  (Pl. Opp'n Br. App. Part 1, Ex. 1.)  This evidence raises a material fact regarding whether the historical pricing information had commercial value to ASUC, was not available but for misappropriation of Safety Test's historical compilation, and was used to seek competitive gains.

{69}    Defendants further argue that there can be no misappropriation of historical pricing because the Departing Employees only used the historical

information with customers with whom they personally had an established relationship. *See Novacare Orthotics & Prosthetics E., Inc. v. Speelman*, 137 N.C. App. 471, 478, 528 S.E.2d 918, 922 (2000) (rejecting claim that former employee's contact with customers he previously serviced on behalf of the plaintiff constituted misappropriation of trade secrets, because he had developed a personal relationship with the customers). However, evidence of misappropriation has been found sufficient where a former employee has access to pricing proposals through former employment, moves to another company, and causes the same customers to move their business to the new company. *See Byrd's Lawn & Landscaping*, 142 N.C. App. at 376–77, 542 S.E.2d at 693.

{70} The record contains information that might support a finding consistent with the outcome in *Byrd's Lawn & Landscaping*. Defendants admit that many of the Safety Test customers that J. Hamrick and McMahan called on its behalf later became new ASUC customers or increased their business with ASUC. After J. Hamrick and McMahan began working for ASUC, the company sold products to ten of Safety Test's customers on nineteen separate occasions for slightly lower prices than Safety Test quoted to them months before. (Pl. Opp'n Br. App. Part 1, Ex. 1.)

{71} The same contested facts exist as to whether Safety Test took adequate measures to protect its information regarding historical customer pricing. Additional measures include that Safety Test executed formal confidentiality agreements with some, but not all of its customers. Safety Test generally did not display pricing on packing slips unless the customer insisted, and in those instances where pricing was particularly favorable, Safety Test would inform the customer that the pricing was confidential; Safety Test claims that it would be difficult to discern the price of components from particular order forms because quotes often do not include specific part numbers or manufacturers.

{72} In sum, the Court concludes that there are material issues precluding summary adjudication as to the claimed trade secret in historical customer pricing as to all Defendants other than Curry.

### iv. Customer Needs and Requirements

{73}    Safety Test makes a general claim regarding its customers' "specific equipment needs, budget requirements, testing requirements, contract requirements, and tooling standardization." (Pl. Supplemental Interrogs. Resps. No. 3(I).) Beyond its reference to Duke Energy's specific needs, Safety Test does not further describe this category of information with specificity.

{74}    While information regarding customer needs and requirements may, in some instances, qualify as a trade secret,[5] there must be specific information which is not generally known or readily ascertainable. Defendants assert that Safety Test has failed in this regard, citing *Washburn*, which held that general allegations that the defendants "acquired knowledge of Yadkin's business methods; clients, their specific requirements and needs; and other confidential information" such as "confidential client information and confidential business information" were too broad and vague to be trade secrets. 190 N.C. App. at 327, 660 S.E.2d at 586. Defendants also cite an unpublished North Carolina Court of Appeals case for its holding that "proprietary customer lists, data, and contract information, as well as client data and client contact computer programs" did not sufficiently identify trade secrets because "nowhere in the record [did] the [plaintiffs] articulate what specific information is encompassed in these broadly defined categories." *Stephenson v. Langdon*, No. COA09-1494, 2010 N.C. App. LEXIS 1682, at *15 (N.C. Ct. App. Sept. 7, 2010).

{75}    In response, Safety Test relies on detailed information it has provided regarding its relationship with Duke Energy. Initially, as to Duke Energy, Safety Test may have met its burden of specificity. It has not, however, provided sufficient specificity for other customers. In the face of a summary judgment motion, a

---

[5] *See, e.g., Philips Elecs. N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 721 (M.D.N.C. 2009) ("[C]ourts have found that special knowledge of customer needs and preferences is a trade secret."); *GE Betz*, ___ N.C. App. at ___, 752 S.E.2d at 649 (finding that "sales reports and customer proposals" constituted protectable trade secrets); *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 174 N.C. App. 49, 56, 620 S.E.2d 222, 228 (2005) (finding that "customer information" and "customer pricing" qualified as a trade secret).

claimant is obligated to produce facts in support of his claim. *See Morrison-Tiffin v. Hampton*, 117 N.C. App. 494, 505, 451 S.E.2d 650, 658 (1995). With regard to trade secret claims in particular, a defendant is entitled to specific notice of what he is claimed to have misappropriated. *See Analog Devices*, 157 N.C. App. at 468, 579 S.E.2d at 453.

{76} Even assuming adequate specificity of its claims, Defendants contend that the trade secret claims in this category must fail because any customer Safety Test might specify would have knowledge of its own needs and requirements and would be willing and able to share that information, so that information is readily ascertainable. In support, Defendants again cite to *Edgewater*, in which the court found that the plaintiffs' customer files—including a customer's name, address, frequency, rates, volumes, contact person, phone numbers and e-mail address—did not constitute trade secrets because "information contained therein is such that can be learned directly from [the plaintiffs'] . . . customers." *Edgewater*, 2009 NCBC LEXIS 21, at *13–14. Moreover, as the *Edgewater* court noted, this information was compiled in the ordinary course of business, and the plaintiffs did not spend significant resources developing the information outside of the cost of doing business. *Id.* at *14.

{77} Safety Test counters that its customers do not necessarily know their needs without first consulting with Safety Test and thus, the information is not readily ascertainable from the customers themselves. However, there is no evidence suggesting that Safety Test restricts its customers' use or disclosure of information regarding its needs or its relationship with Safety Test once Safety Test has discerned those needs on their behalf. Where a business provides information to customers without restricting the information's further use or dissemination, the information at issue does not qualify as a trade secret. *Area Landscaping*, 160 N.C. App. at 526, 586 S.E.2d at 511–12.

{78} In sum, the Court concludes that Safety Test has not developed a record or forecasted evidence adequate to withstand summary judgment against its trade secret claims as to the particularized needs of its customers.

## B. Plaintiff Is Entitled to Pursue Its Tortious Interference Claim

{79}     To prove tortious interference with a prospective advantage, a claimant must show than an individual induced a third party to refrain from entering into a contract with the plaintiff without justification. *DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002) (citing *Cameron v. New Hanover Mem'l Hosp.*, 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982)).  The claimant must also show that the contract would have resulted but for the defendant's interference.  *Cameron*, 58 N.C. App. at 440, 293 S.E.2d at 917.

{80}     Where the defendant acts justifiably in inducing a third party to forego entering into a contract with the plaintiff, no action for tortious interference lies. *Id.*  Competitors are typically justified in inducing customers to refrain from entering contracts with one another, but they lose this justification if their conduct is anticompetitive.  *Id.* at 441, 293 S.E.2d at 917.

{81}     Plaintiff predicates its claim for anticompetitive conduct, and thus loss of justification, on its trade secret claims which the Court has, in part, allowed to survive the Motion.  Likewise, Defendants claim a competitor's justification on the basis that there was no unlawful misappropriation.  The Court concludes that disposition of the tortious interference claim should await further adjudication of the trade secret claims.

## C. Further Disposition of Plaintiff's Claim for Unfair and Deceptive Trade Practices Against Defendants Other Than Curry Should Be Deferred Pending Resolution of Other Claims

{82}     To succeed on a UDTP claim, a claimant must show "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*. 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001).  A violation of the Trade Secrets Act may also constitute an unfair trade practice.  *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 659–60, 670 S S.E.2d 321, 329 (2009); *Drouillard v. Keister Williams Newspaper Servs., Inc.*, 108 N.C. App. 169, 172–73,

423 S.E.2d 324, 326–27 (1992).  As Plaintiff's trade secret claims survive in part, they form an adequate foundation for allowing the UDTP claim to proceed beyond summary judgment as to all Defendants other than Curry.

### D. Final Disposition of the Civil Conspiracy Claim Should Await Trial

{83}    The Court concludes that Safety Test may continue to pursue its civil conspiracy claim against Defendants other than Curry.   It do so with substantial reluctance and may well reach a different conclusion when considering a motion for directed verdict at trial.  A conspiracy claim should not be used to mask the weakness of underlying claims on which the conspiracy allegations are based.  Yet it is difficult to dismiss a conspiracy claim summarily because the elements of a conspiracy claim are broadly stated.

{84}    "The elements of a civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 71 (2008) (quoting *Privette v. Univ. of N.C.*, 96 N.C. App. 124, 139, 385 S.E.2d 185, 193 (1989)).  There is no separate cause of action for civil conspiracy, which must be based on an underlying wrong.  *Esposito v. Talbert & Bright, Inc.*, 181 N.C. App. 742, 747, 641 S.E.2d 695, 698 (2007) (quoting *Dove v. Harvey*, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005)).

{85}    "Although liability may be established by circumstantial evidence, the evidence of the agreement must be more than a suspicion or conjecture to justify submission of the issue to the jury." *Morrison-Tiffin*, 117 N.C. App. at 505, 451 S.E.2d at 658; *see also Dickens v. Puryear*, 302 N.C. 437, 456, 276 S.E.2d 325, 337 (1981); *Elliot v. Elliot*, 200 N.C. App. 259, 264, 683 S.E.2d 405, 409 (2009).  A motion for summary judgment "triggers the plaintiff's responsibility to produce facts, . . . sufficient to show that he will be able to prove his claim at trial." *Morrison-Tiffin*, 117 N.C. App. at 505, 451 S.E.2d at 658. "[A]n allegation [of civil conspiracy], without any supporting facts, is insufficient to withstand summary

judgment." *King v. N.C. Dep't of Transp., Div. of Motor Vehicles*, 121 N.C. App. 706, 708, 468 S.E.2d 486, 489 (citing *Friel v. Angell Care, Inc.*, 113 N.C. App 505, 510, 440 S.E.2d 111, 114 (1994)).

{86}    When a plaintiff invokes a conspiracy theory to attack a move by multiple employees from one employer to another, a court must be sensitive to the potential role of the doctrine of intracorporate immunity. *See State ex rel. Cooper v. Ridgeway Brands, Mfg., LLC*, 184 N.C. App. 613, 625, 646 S.E.2d 790, 799 (2007) (noting "[a]n allegation that a corporation is conspiring with its agents, officers or employees is tantamount to accusing a corporation of conspiring with itself," meaning that two persons were not present to form conspiracy), *aff'd in part, rev'd in part on other grounds*, 362 N.C. 431, 666 S.E.2d 107 (2008); *see also Maurer v. SlickEdit, Inc.*, 2005 NCBC LEXIS 2, *34–35 (N.C. Super. Ct. May 16, 2005) (dismissing civil conspiracy claim against corporation and its agents under intracorporate immunity doctrine).

{87}    Plaintiff seeks to support its conspiracy claim on the following evidence: (1) upon leaving Safety Test, J. Hamrick took with him certain e-mail communications with a Safety Test supplier and a historical income report that summarized Safety Test's financial performance over the past twenty years; (2) after resigning from Safety Test, Curry took three aprons that he asked a Safety Test employee to make him, which he states were for personal use; (3) in recruiting McMahan, J. Hamrick, and L. Hamrick, ASUC expressed an interest in how many customers each could bring with them from Safety Test to ASUC; and (4) when meeting with L. Hamrick regarding potential employment at Safety Test, one of the Prices remarked that ASUC did not know how to do the "stuff" Safety Test did and that ASUC wanted what Safety Test had.  (L. Hamrick Aff. ¶ 15).

{88}    Even granting Safety Test favorable inferences, the Court finds no reasoned basis to pursue a conspiracy claim against Curry.  As to other Defendants, the Court must, at this stage, infer that ASUC, its owners, J. Hamrick, and McMahan reached an agreement while the latter two were still employed at Safety Test, thereby overcoming a defense in intracorporate immunity.  The Court then

allows the conspiracy claim to survive. Should Plaintiff fail to produce evidence adequate to prove such an agreement at trial, the Court may grant a motion for directed verdict.

## VI. CONCLUSION

{89} For the foregoing reasons:

1. Curry's Motion for Summary Judgment is GRANTED as to all claims against him, which are DISMISSED with prejudice;

2. Plaintiff's claimed trade secret as to specific customer needs and requirements fails as a matter of law, and a trade secret claim based on this category of information may not be pursued at trial;

3. In all other respects, Defendants' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED, this the 23rd day of April, 2015.